

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-31-2008

# Richard Mullarkey v. Leonard Tamboer

Precedential or Non-Precedential: Precedential

Docket No. 05-4081

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Richard Mullarkey v. Leonard Tamboer" (2008). *2008 Decisions.* Paper 743.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/743

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 05-4081

IN RE: RICHARD JOHN MULLARKEY,

Debtor

RICHARD MULLARKEY,

Appellant

v.

LESLIE TAMBOER; LEONARD TAMBOER; JOHN
MCKENNA;
DAVID GHERLONE; STEVEN KARTZMAN

Case No: 05-4651

RICHARD MULLARKEY,

Appellant

v.

LEONARD TAMBOER; LESLIE TAMBOER;
JOHN MCKENNA; DAVID GHERLONE

On appeal from the United States District Court
for the District of New Jersey
District Court Nos. 05-CV-2594, 05-CV-2010
District Judge: The Honorable Faith S. Hochberg

Argued February 13, 2008

Before: SLOVITER and SMITH, *Circuit Judges*,
and DIAMOND, *District Judge**
(Filed: July 31, 2008)

Christian G. Vergonis (ARGUED)
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001-0000

*Counsel for Appellant*

Kathleen B. Riordan (ARGUED)
Hack, Piro, O'Day, Merklinger, Wallace & McKenna
30 Columbia Turnpike
P.O. Box 941
Florham Park, NJ 07932-0000

---

*The Honorable Gustave Diamond, Senior District Judge for the United States District Court in the Western District of Pennsylvania, sitting by designation.

Gina M. Longarzo, Esq.
244 Green Village Road
Madison, NJ 07940

*Counsel for Appellee*

Steven Kartzman
1 Professional Quadrangle
Sparta, NJ 07871-2310
Pro Se

---

OPINION

---

SMITH, *Circuit Judge*.

Richard Mullarkey and the Tamboers each owned an undivided one-half interest in a parcel of property known as "The Princeton Estates," or 86 Branchville Road, Hampton Township, New Jersey. The Tamboers agreed to pay Mullarkey's original bank mortgage and, in turn, held a mortgage on his share of the property. The mortgage was dated June 2, 1990, and was recorded on February 28, 1991. Mullarkey ultimately defaulted on his mortgage obligations. On July 2, 1997, the Tamboers initiated a foreclosure action in New Jersey state court. Mullarkey did not appear and the state court

3

entered a default judgment of foreclosure on March 25, 1999, and scheduled a Sheriff's Sale. On June 4, 1999, Mullarkey filed a Chapter 13 bankruptcy petition, which triggered the automatic stay provision of the Bankruptcy Code and stayed the Sheriff's Sale.

On April 17, 2000, the Tamboers filed a motion seeking relief from the automatic stay based on Mullarkey's continued failure to make payments pursuant to the terms of the mortgage. The Bankruptcy Court granted Mullarkey additional time to obtain approval for subdivision of the property to enable him to sell his interest. The approvals were not obtained[1] and approximately a year later, on March 13, 2001, the Bankruptcy Court entered an order granting the Tamboers relief from the automatic stay. Mullarkey appealed this decision to the District Court and requested that the District Court stay implementation of the Stay Relief Order pending the outcome of the appeal. The Court denied the stay request. Mullarkey also sought to stay the Sheriff's Sale in state court, which was also denied. In addition, he made an application to the Bankruptcy Court for an order vacating the order vacating stay, which was also denied.

The Tamboers purchased the property at the Sheriff's

---

[1] Mullarkey contends that he was unable to obtain municipal approval for subdivision of the property because the Tamboers would not give him the engineering maps, approvals and other necessary documentation.

4

Sale on July 6, 2001. Following the Sheriff's Sale, Mullarkey's bankruptcy case remained open while he completed the sale of an unrelated property and made the payments called for by his reorganization plan. His reorganization plan was confirmed on April 11, 2001.

On December 2, 2003, Mullarkey filed a pro se Complaint against the Tamboers in the United States District Court for the District of New Jersey.[2] The essence of Mullarkey's allegations is that the Tamboers committed fraud on the Bankruptcy Court and that their actions constituted "several acts of racketeering" in violation of the federal Racketeer Influenced and Corrupt Organizations (RICO) statute. The District Court ultimately determined that the "matter over which the Plaintiff complains is related to the Bankruptcy Proceeding" and referred the matter to bankruptcy.[3]

---

[2] On December 3, 2003, the District Court issued an order instructing Mullarkey to "submit a clear and concise statement of the basis for federal subject matter jurisdiction." On December 19, 2003, Mullarkey responded by setting forth ten "facts" that form the basis for his pro se Complaint. As such, when we refer to Mullarkey's Complaint throughout this opinion, it is to these "facts" that we are referring.

[3] Mullarkey also filed the same Complaint in the Bankruptcy Court on January 30, 2004 against the Tamboers. On April 8, 2004, Mullarkey filed an Amended Complaint adding John McKenna and David Gherlone to the case. Mullarkey asserted

After the Complaint was referred to the Bankruptcy Court, Mullarkey filed four motions. The Court denied each motion in an order dated January 12, 2005. The motions were for: 1) a discretionary change of venue to the district court; 2) joinder of Steven Kartzman (Mullarkey's former attorney) as a necessary party; 3) "a reference to a prosecuting authority"; and 4) a motion to reconsider the order dismissing Defendant Gherlone. On January 21, 2005, Mullarkey appealed the denial of these four motions. However, he incorrectly filed his appeal with the Bankruptcy Court. The appeal was eventually transferred to the District Court and assigned civil docket number 05-2010. It appears, however, that only two of the four orders were ever recorded on the District Court docket. At all events, the District Court affirmed the Bankruptcy Court's denial of Mullarkey's motions on August 2, 2005. Both parties seem to agree, however, that the District Court never actually reviewed the Bankruptcy Court's order denying the motions because the order refers to the "April 11, 2005 Order of the Bankruptcy Court dismissing Mullarkey's Fraud Complaint." On August 15, 2005, Mullarkey filed a motion for reconsideration of the District Court's order. He did not argue that the District Court did not consider the orders from which he appealed; rather, he claimed that the District Court "overlooked

that both of these individuals withheld evidence from the Bankruptcy Court as to the criminal intent of the Tamboers regarding the sale of the property. Adversary proceedings were dismissed as to David Gherlone on October 18, 2004.

the fact that the [Bankruptcy Judge's] order dismissing the case was not on the merits." He argued that the District Court erred by failing to consider the merits of his claim. On August 23, 2005, the District Court denied the motion for reconsideration as untimely filed and without merit. Mullarkey timely appealed to this Court from the denial of his motion for reconsideration.

In the meantime, the Tamboers moved to dismiss Mullarkey's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), which by virtue of Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, is made applicable to bankruptcy proceedings. The Bankruptcy Court granted their motion to dismiss in an order and opinion dated April 11, 2005.[4] The Bankruptcy Court concluded 1) that the Complaint's allegations of fraud were raised in prior proceedings and therefore were barred by the doctrines of res judicata and collateral estoppel (or alternatively, the entire controversy

---

[4] Although the Defendants filed the motion pursuant to Federal Rule of Civil Procedure 12(b)(6), the Bankruptcy Court treated the motion as one for summary judgment. The Court noted that if the moving party introduces matters outside of the pleadings, the motion is treated as one for summary judgment under Federal Rule of Civil Procedure 56, made applicable to bankruptcy proceedings under Federal Rules of Bankruptcy Procedure 7056. The Bankruptcy Court's opinion suggests that it looked at "numerous submissions made by [Mullarkey] in prior proceedings before this Court and other courts."

7

doctrine), and 2) that Mullarkey did not have standing to bring criminal charges and so, to the extent his Complaint can be read to include criminal charges, he lacked standing to bring them.

Mullarkey appealed the Bankruptcy Court's order granting the motion to dismiss. The District Court affirmed the Bankruptcy Court's order in a one-page order dated August 26, 2005, and denied Mullarkey's motion for reconsideration on October 4, 2005. Mullarkey timely appealed to this Court from the denial of his motion for reconsideration.

I.

In this appeal, Mullarkey argues that bankruptcy jurisdiction did not exist over his Complaint, and that even if there was bankruptcy jurisdiction, the District Court erred in treating the matter as a core proceeding—allowing the Bankruptcy Court to enter a final judgment pursuant to 28 U.S.C. § 157 and applying a deferential standard of review in lieu of the required de novo review. Mullarkey further argues that his Complaint should not have been dismissed on preclusion grounds, and that he may seek a civil remedy for the Defendants' violation of the federal RICO statute, 18 U.S.C. § 1964.

The District Court had jurisdiction to review the Bankruptcy Court's order under 28 U.S.C. § 158. We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291. Our review of

the District Court's ruling in its capacity as an appellate court is plenary, and we review the bankruptcy judge's legal determinations de novo, *In re O'Lexa*, 476 F.3d 177, 178 (3d Cir. 2007). We review "its factual findings for clear error and its exercise of discretion for abuse thereof." *In re United Healthcare Sys., Inc.*, 396 F.3d 247, 249 (3d Cir. 2005). The first question we must resolve is whether the Bankruptcy Court had subject matter jurisdiction and the final adjudicative authority to resolve the state-law claims alleged in Mullarkey's Complaint.

## II.

As with all courts, courts in bankruptcy must satisfy themselves of subject matter jurisdiction. A bankruptcy court has subject matter jurisdiction over "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1).[5]

---

[5] Section 1334(b) of Title 28 states that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Section 157(a) of the same Title states that "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the

9

Therefore, a bankruptcy court must make an initial determination that the claims before it fall within the purview of section 157 of Title 28. Once this determination has been made, § 157 invests two levels of authority in a bankruptcy judge depending upon which of the two categories a case or proceeding falls into. *In re Seven Fields Dev. Corp.*, 505 F.3d 237, 254 (3d Cir. 2007) (citing 28 U.S.C. § 157). The two categories are (1) "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11," 28 U.S.C. § 157(b)(1) (collectively known as "core proceedings"), and (2) "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11," 28 U.S.C. § 157(c)(1) ("non-core proceedings"). *Id.* (citations omitted). While it is clear that a bankruptcy court has jurisdiction over all proceedings "related to" a bankruptcy case, the core/non-core distinction is relevant to the scope of the bankruptcy court's powers upon referral: in core proceedings, the bankruptcy judge may issue final orders and judgments. *See* 28 U.S.C. § 157(b)(1). In non-core proceedings, the bankruptcy court's powers are more circumscribed: it must submit "proposed findings of fact and conclusions of law" to the district court, which enters an order only after conducting de novo review.[6] *See* 28 U.S.C. § 157(c)(1).

---

bankruptcy judges for the district."

[6] A bankruptcy court may, however, issue final orders and judgments in non-core proceedings if both parties consent. 28

10

Thus, the core/non-core distinction is a critical one with respect to a bankruptcy court's adjudicative authority. To this end, § 157(b)(3) states that:

> The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

28 U.S.C. § 157(b)(3). As the Bankruptcy Court in the instant case failed to make any such determination before granting a dispositive motion and entering final judgment, we must decide whether this statutory provision requires a bankruptcy court to explicitly determine, as a jurisdictional prerequisite, if a proceeding is core. The Fourth Circuit in *In re Johnson*, 960 F.2d 396, 400 (4th Cir. 1992), pointed out that:

> [s]ome courts hold that failure of the bankruptcy court to make a § 157(b)(3) finding deprives the bankruptcy court of jurisdiction; and the failure of the parties to request the finding does not waive their right to later object that the finding was a necessary predicate to jurisdiction. *In re Wefco*,

U.S.C. § 157(c)(2).

11

97 B.R. 749, 750–51 (E.D.N.Y. 1989) (failure to determine whether matter is core or non-core is not harmless error); *In re Marill Alarm Systems Inc.*, 81 B.R. 119, 122 (S.D.Fla. 1987), aff'd sub nom. *Marill Alarm Sys. v. Equity Funding*, 861 F.2d 725 (11th Cir. 1988) (not precedential) (if bankruptcy judge enters final judgment without making determination under § 157(b)(3) it must be invalidated; failure of parties to move for determination does not waive error); *In re Nell*, 71 B.R. 305, 310 (D.Utah 1987) (same). Other courts hold that a party's failure to request a 157(b)(3) finding waives any objection to the lack of such finding. *In re Rath Packing Co.*, 75 B.R. 137, 138 (N.D.Iowa 1987), *aff'd sub nom*. *Rath Packing Co. v. United Food*, 860 F.2d 1086 (8th Cir.1988), *cited in* 1 Collier on Bankruptcy (MB) ¶ 3.01 at 3-52 (15th ed. 1989); *Rainey v. International Harvester Credit Corp.*, 59 B.R. 987, 989–90 (N.D.Ill.1986).

The Fourth Circuit was persuaded by the latter view, concluding that the lack of a jurisdictional finding under § 157(b)(3) does not, in itself, deprive a bankruptcy court of jurisdiction. *In re Johnson*, 960 F.2d at 400 n.2.

We agree with the view adopted by the Fourth Circuit and hold that the Bankruptcy Court was not deprived of jurisdiction over Mullarkey's Complaint for failure to make the determination under § 157(b)(3). We are persuaded that this is

12

the correct approach because § 157(b)(3) only requires that a bankruptcy judge determine whether a proceeding is core or non-core. Such a determination does not affect the bankruptcy court's power to hear the case. Rather, it affects the form of the bankruptcy court's disposition, i.e., whether it is final and appealable to the district court, or a report and recommendation to be reviewed by the district court. In addition, the text of § 157(b)(3) suggests that a party may waive the right to this determination by failing to make a timely motion. *See, e.g.*, *In re Sheridan*, 362 F.3d 96, 100 (1st Cir. 2004) ("[T]he protections afforded by the *Northern Pipeline* core/non-core distinction may be waived or forfeited, either by (i) consenting to the bankruptcy court's treatment of an otherwise non-core proceeding as core, or (ii) failing to raise or pursue the issue adequately on appeal."); *In re Johnson*, 960 F.2d at 400 ("By failing to object to the lack of a jurisdictional determination under 28 U.S.C. § 157(b)(3), and acquiescing to the jurisdiction of the bankruptcy court to enter dispositive orders . . . Canal and RED waived any requirement the bankruptcy court had to make a determination of its jurisdiction under 28 U.S.C. § 157(b)(3)."). Fairly interpreted, the purpose of § 157(b)(3) is to assure that a bankruptcy court acts with the appropriate adjudicative authority in considering claims in bankruptcy. While parties may acquiesce in a bankruptcy court's entry of a dispositive order within its subject matter jurisdiction, subject matter jurisdiction may neither be waived nor forfeited by the parties. Thus, we are satisfied that § 157(b)(3) is not jurisdictional.

13

The next step in our analysis requires us to determine whether the Bankruptcy Court had subject matter jurisdiction over Mullarkey's Complaint, and if so, whether the claims contained within it constitute core or non-core proceedings. This determination will also reveal the Bankruptcy Court's adjudicative authority and the District Court's standard of review. As our opinion in *In re Seven Fields* illustrates, we could proceed by engaging in a two-step analysis in which we first inquire whether there is federal jurisdiction over Mullarkey's proceeding by asking whether the case is "related to" the bankruptcy, because "related to" is the broadest category of cases over which federal bankruptcy jurisdiction is exercised. *See* 505 F.3d at 260. Pursuant to that approach, we would then determine whether the matter is core—allowing for the Bankruptcy Court to issue the final order that it did in this case—or a non-core matter, in which the Bankruptcy Court was only permitted to make recommendations to the District Court. *See id.* However, if we conclude that the case "arises in" the bankruptcy proceeding, then by definition the Bankruptcy Court has both subject matter jurisdiction and the authority to enter final orders. *See id.* at 257. Accordingly, we would not need to follow the two-step approach. We pursue this latter course.

In order to determine whether Mullarkey's claims fall within the Bankruptcy Court's core jurisdiction by "arising in" the bankruptcy, we must examine the allegations in Mullarkey's Complaint. In *Halper v. Halper*, we adopted a claim-by-claim approach to determine the extent of a bankruptcy court's

14

jurisdiction. 164 F.3d 830, 839 (3d Cir. 1999) (citing *In re N. Parent, Inc.*, 221 B.R. 609, 626 (Bankr.D.Mass. 1998) ("[E]ach of Debtor's fourteen causes of action will have to be separately analyzed to determine whether it falls within the bankruptcy court's core jurisdiction.")). In the case at bar, the Complaint was filed pro se. Like many pro se pleadings, it is not a model of clarity. We think, however, that it is fair to characterize Mullarkey's submissions to the Court as follows:

1.  That the Defendants knowingly and fraudulently concealed from the trustee $375,000 belonging to his estate.

2.  That the Defendants knowingly and fraudulently made a false certification to the bankruptcy court under penalty of perjury.

3.  That the Defendants presented a false claim of $182,000 to the bankruptcy court.

4.  That the Defendants attempted to obtain property title in a fraudulent manner.

5.  That the Defendants committed the crime of solicitation of conspiracy.

6.  That these acts occurred over the course of several years and caused economic injury.

7.  That the Defendants were involved in a

conspiracy.

8.     That the Defendants fraudulently foreclosed on the property with a bogus lien.

9.     That the Defendants concealed the sale of the property from the bankruptcy court/trustee through false statements.

10.    That the Defendants have violated the RICO statute.

We are satisfied that these allegations state, at least, a claim for fraud with regard to an asset of the bankruptcy estate, as the alleged fraud occurred during the bankruptcy process itself. The allegations of fraud presented in paragraphs one through four and nine are predicated on conduct that occurred during the bankruptcy process.[7] As such, the alleged fraud

---

[7] As to the remaining portion of Mullarkey's Complaint, those matters are subsumed in ¶¶ 1–3 and ¶ 9, or are otherwise too vague. Nor do we believe they would be the basis for any additional monetary award for Mullarkey. The allegations do not appear to be sufficient to state a civil claim for violations of the federal RICO statute, whether it be for mail fraud, wire fraud or bankruptcy fraud. *See* 18 U.S.C. § 1964. Furthermore, while Mullarkey asserted in his opening brief that he could seek a civil remedy for the Tamboers' violation of the federal RICO statute, he failed to present any argument in support. Thus, we deem this claim to be waived. *Laborers' Intern. Union of N. Am.,*

16

"implicated the integrity of the entire bankruptcy process" and was "inseparable from the bankruptcy context." *See In Re Seven Fields*, 505 F.3d at 260–61. If we accept Mullarkey's allegations as true, the Bankruptcy Court granted relief from the automatic stay as a result of the conduct of the Defendants, thereby allowing the Defendants to proceed with the foreclosure and sale of Mullarkey's share of the property. If, but for the Defendants' conduct, the disposition of the property would have been otherwise and would have resulted in additional funds for the bankruptcy estate, it appears that the conduct of the Defendants implicated the integrity of the bankruptcy process. Thus, the allegations of misconduct here are similar in nature to the misconduct which our Court was concerned with in *In Re Seven Fields* and which we concluded fell within the bankruptcy court's core jurisdiction.

In *In re Seven Fields*, the bankruptcy court exercised jurisdiction over a complaint alleging state law claims of professional negligence, fraud and deceit, and negligent

---

*AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (citation omitted) ("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'"); *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.").

17

misrepresentation against the accounting firm of Ernst & Young. 505 F.3d at 239. The complaint alleged that "as a result of the work that Ernst & Young performed during the bankruptcy proceedings and its representations to the bankruptcy court, the bankruptcy court deemed the Debtors to be insolvent." *Id.* at 261. The complaint further alleged that these representations of insolvency were "a significant factor in bringing about the court's confirmation of the plan." *Id.* Essentially, the parties were led to believe that they were in serious debt and, because of that, the parties sold their assets at below market value, suffering losses on their investments and failing to realize a return of the full amount of their investments. *Id.* at 241. In concluding that "aris[ing] in" jurisdiction was present, our Court noted that the claims arose pre-confirmation inasmuch as the conduct on which the parties predicated the claims occurred during the bankruptcy process. *Id.* at 260. Second, we noted that the alleged malpractice "implicated the integrity of the entire bankruptcy process" and was "inseparable from the bankruptcy context." *Id.* at 260–61.

While our *In Re Seven Fields* holding involved allegations of professional malpractice, the same concern for misconduct that directly affects the bankruptcy estate exists in the present case. Indeed, our Court stated that "few issues are as important in the bankruptcy process as the bankruptcy court's conclusion as to the solvency of a debtor. The solvency analysis is the cornerstone of the distribution plan. Here, both the integrity of the bankruptcy process and the solvency of the

Debtors have been drawn into question." *Id.* Presumably, in our case, Mullarkey's interest in the property at issue would have had an effect on the bankruptcy court's evaluation of his solvency had he been able to realize the value of that interest through sale of the property.

Based on the foregoing, we conclude that the Bankruptcy Court had subject matter jurisdiction over the Complaint filed by Mullarkey. Because the matters were core, the Court properly exercised final adjudicative authority over the matter, and the District Court did not err in applying a deferential standard of review.

### III.

The Bankruptcy Court erred, however, with respect to the merits. On April 11, 2005, the Bankruptcy Court filed an order granting the Defendant's Motion to Dismiss Mullarkey's Complaint. The Bankruptcy Court held that Mullarkey's claims were precluded by the doctrines of res judicata, collateral estoppel, and alternatively, the entire controversy doctrine, because "[a]ll of [his] arguments have been repeatedly rejected by this Court, by the district court on appeal and on subsequent motions for reconsideration, as well as by the state court." Based on the record before us, we are compelled to disagree.

### A.

As part of its analysis of the res judicata and collateral estoppel doctrines, the Bankruptcy Court noted that there is no dispute as to party identity. It also found "that the claims and issues involving [Mullarkey] and the Defendants . . . are identical to those previously raised and litigated not only in this Court, but in the district and state courts as well." That Court stated that the language in Mullarkey's present Complaint is similar to submissions he made in prior proceedings before the Bankruptcy Court and other courts. Finally, the Bankruptcy Court asserted that all of Mullarkey's claims were considered and rejected in "its initial determination granting the Tamboers relief from the automatic stay in March 2001, as well as in the Debtor's motion for a stay of the Stay Relief Order."

The doctrine of res judicata bars not only claims that were brought in a previous action, but also claims that could have been brought. *Post v. Hartford Ins. Co.*, 501 F.3d 154, 169 (3d Cir. 2007). It "protect[s] litigants from the burden of relitigating an identical issue with the same party or his privy and . . . promot[es] judicial economy by preventing needless litigation." *Id.* (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 (1979)). Both New Jersey and federal law apply res judicata or claim preclusion when three circumstances are present: "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *Id.* (quoting *Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 963 (3d Cir. 1991)).

In addition, New Jersey courts bar the relitigation of finally determined issues through the doctrine of collateral estoppel. Collateral estoppel "bars relitigation of any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action." *Tarus v. Borough of Pine Hill*, 916 A.2d 1036, 1050 (N.J. 2007) (quotations omitted). A party asserting collateral estoppel must show that

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*Twp. of Middletown v. Simon*, 937 A.2d 949, 954 (N.J. 2008). The application of the collateral estoppel doctrine is not automatic, and should not be applied "if there are sufficient countervailing interests." *Velasquez v. Franz*, 589 A.2d 143, 153 (N.J. 1991) (quoting *In re Coruzzi*, 95 N.J. 557, 568 (1984)). Importantly, this doctrine precludes relitigation only of questions "distinctly put in issue" and "directly determined" adversely to the party against which the estoppel is asserted. *N.J.-Phila. Presbytery of the Bible Presbyterian Church v. N.J. State Bd. of Higher Educ.*, 654 F.2d 868, 876 (3d Cir. 1981)

21

(quoting *City of Plainfield v. Public Serv. Gas and Elec.*, 412 A.2d 759, 765–66 (N.J. 1980)). "Moreover, under the New Jersey rule, if the judgment is based on one or more of several grounds, but does not expressly rely on any of them, none is conclusively established, since a subsequent court cannot tell what issue or issues were in fact fully adjudicated." *Id.* (citing *Ettin v. Ava Truck Leasing, Inc.*, 251 A.2d 278, 287 (N.J. 1969)).

The Bankruptcy Court's reliance on its stay proceedings to support preclusion, either by res judicata or collateral estoppel, was error. The prior bankruptcy orders respecting the motion to stay were not final judgments, and by their nature cannot have preclusive effect on the instant action. The hearing on a motion for relief from stay is meant to be a summary proceeding, and the statute requires prompt action by the bankruptcy court. 11 U.S.C. § 362(e).[8]   Section § 362(e)

---

[8] Section 362(e) reads:

(1) Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of

22

this section. A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under subsection (d) of this section. The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (d) of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances.

(2) Notwithstanding paragraph (1), in a case under chapter 7, 11, or 13 in which the debtor is an individual, the stay under subsection (a) shall terminate on the date that is 60 days after a request is made by a party in interest under subsection (d), unless--

(A) a final decision is rendered by the court during the 60-day period beginning on the date of the request; or

(B) such 60-day period is extended--

(i) by agreement of all parties in interest; or

(ii) by the court for such specific period of time as the court finds is required for good cause, as

provides that a bankruptcy court must hold a preliminary hearing on a motion to lift the stay within thirty days from the date the motion is filed, or the stay will be considered lifted. *Id.* In addition, relief from a stay is obtained by a simple motion, Fed.R.Bankr.P. 4001, and it is a "contested matter," rather than an adversary proceeding. *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 33 (1st Cir. 1994) (citing Fed.R.Bankr.P. 9014; Advisory Committee Note to Fed.R.Bankr.P. 7001 ("[R]equests for relief from the automatic stay do not commence an adversary proceeding.")).

The First Circuit in *Grella* recognized that a hearing on a motion for relief from stay is a "summary proceeding of limited effect," and that

> [t]he limited grounds set forth in the statutory language, read in the context of the overall scheme of § 362, and combined with the preliminary, summary nature of the relief from stay proceedings, have led most courts to find that such hearings do not involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a creditor has a colorable claim to property of the estate.

described in findings made by the court.

11 U.S.C. § 362.

24

42 F.3d at 32–33.[9]  The Court concluded that "[t]he statutory and procedural schemes, the legislative history, and the case law all direct that the hearing on a motion to lift the stay is not a proceeding for determining the merits of the underlying substantive claims, defenses, or counterclaims." *Id.* at 33.  As the Seventh Circuit also pointed out, at issue in a § 362 hearing is only whether there is a colorable claim of a lien on property of the estate.  *In re Vitreous Steel Prod. Co.*, 911 F.2d 1223, 1234 (7th Cir. 1990).  As such, it held that the determination of the § 362 motion was not a bar to the prosecution of the adversary complaint before it.  *Id.* at 1234.  It explained that

---

[9] The First Circuit cited as substantial authority for this proposition: *Estate Construction Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 219 (4th Cir. 1994) (hearings to lift the stay are summary in character, and counterclaims are not precluded later if not raised at this stage); *In re Vitreous Steel Prod. Co.*, 911 F.2d 1223, 1232 (7th Cir. 1990) (questions of the validity of liens are not at issue in a § 362 hearing, but only whether there is a colorable claim on property); *In re Johnson*, 756 F.2d 738, 740 (9th Cir. 1985), *cert. denied*, 474 U.S. 828 (1985) (relief from stay hearings are limited in scope to adequacy of protection, equity, and necessity to an effective reorganization, and validity of underlying claims is not litigated); *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 658 (Bankr. S.D.N.Y.), *aff'd*, 962 F.2d 1 (2d Cir. 1991) (decision to lift stay does not involve determination of counterclaims, and thus those claims are not precluded later).

Collateral estoppel is not a bar because the only issues necessarily decided at the § 362 hearing were whether the Bank had a colorable claim of a lien and whether the amount of that lien exceeded the value of the property. It was not necessary to reach questions of . . . collu[sion] with the Bank, or questions of preferential transfers under § 547, or questions of fraudulent conveyances under § 548, or questions of commercial reasonableness of the sale under state law. Indeed, none of these issues could properly have been raised, and therefore the § 362 hearing was not res judicata as to those issues.

*Id.*

Here, the initial bankruptcy order vacating the automatic stay, dated March 13, 2001, is brief and does not suggest the basis upon which the court granted relief from the stay.[10] There

---

[10] The documents filed by Mullarkey's attorney opposing the Motion to Vacate do not explicitly contain any allegations of fraudulent conduct. The documents do detail two attempts by Mullarkey to sell his property. The documents indicate that he secured a willing buyer on April 11, 2000, for $480,000, of which $240,000 would go to Mullarkey. His Chapter 13 plan provided for payment of his share of his debt from the sale proceeds, and he planned to amend his plan to provide for the treatment of the Defendants as secured creditors. The $240,000 sum was $43,000 more than the amount claimed to be due to the Defendants. The submissions to the Bankruptcy Court also contended that the Defendants failed to produce certain

26

is nothing in the record to suggest that any allegations of fraud had been made up to this point. It would certainly be reasonable to infer that the bankruptcy judge vacated the stay because of Mullarkey's continued failure to make his regular monthly mortgage payments outside of his Chapter 13 plan, as well as his failure to sell his interest in the property. In light of the record on appeal, and the summary nature of stay proceedings in general, we conclude that the Bankruptcy Court's initial grant of relief does not have preclusive effect on Mullarkey's Complaint.[11]

---

documents and preliminary subdivision could not be obtained without them. Mullarkey alleges that the Defendants could have reapplied for subdivision approval when it lapsed, but failed to do so. As a result, Mullarkey could not obtain the documents he needed to sell the land until November 5, 2000, and at that time he reapplied for subdivision. It appears during the course of this that Mullarkey lost his initial buyer. Also before the Bankruptcy Court was the contention that Mullarkey had another buyer on March 6, 2001, for $329,000, of which he would have been entitled to half. This amount would have been less than what the Defendants claimed that he owed them.

[11] On May 29, 2001, Mullarkey, then proceeding pro se, moved the Bankruptcy Court to vacate the previous order vacating stay. In an order as brief as the first, and with similar lack of explanation, his motion was denied on June 19, 2001. The docketing record on appeal indicates that after the Bankruptcy Court initially vacated the stay, Mullarkey sent the

The Bankruptcy Court also indicated that the New Jersey state court foreclosure proceedings have preclusive effect over the instant Complaint. We are at a loss to determine how to afford these proceedings preclusive effect. The record on appeal provides us no indication as to whether there was a merits determination during the New Jersey state court's foreclosure proceeding. The Defendants initiated a foreclosure action in state court and a judgment of foreclosure was entered on March 25, 1999 when Mullarkey failed to appear and a Sheriff's Sale was scheduled for May 10, 1999. The Sheriff's

---

Court a letter detailing a scheme by the Defendants. Mullarkey essentially argued that the Defendants had devised a plan to intentionally deny him his share of partnership assets, and were effectuating that plan by making misrepresentations to the bankruptcy court in order to have the stay lifted so they could proceed with an outside contract to sell the property. The record gives no indication that these allegations were litigated, considered and rejected by the Bankruptcy Court. If they were rejected by the Court, there is no indication that they were essential to its judgment. Indeed, it is possible that the orders were based on one or more of several grounds, but neither order expressly relies on any of them, none is conclusively established, and, as such, we fail to see how this Court can tell for purposes of claim or issue preclusion what issue or issues were in fact fully adjudicated. Thus, this order does not have preclusive effect over the instant Complaint for the same reasons the Bankruptcy Court's initial order does not have preclusive effect.

Sale did not take place as scheduled and it subsequently was stayed when Mullarkey filed a Chapter 13 bankruptcy petition. After the Bankruptcy Court vacated the stay on March 13, 2001, Mullarkey also sought to stay the Sheriff's Sale in state court. The state court denied Mullarkey's request after a hearing, and the property was sold on or about July 6, 2002, to the Tamboers.

The record, by way of the Bankruptcy Court's order dismissing Mullarkey's Complaint, does indicate that Mullarkey submitted a certification to the state court in support of his motion to stay the Sheriff's Sale, and that in it he specifically alleged that the Defendants fraudulently stated that the mortgage was due, that the Defendants fraudulently concealed the contract of sale for the property from him and the Bankruptcy Court, and that the Defendants fraudulently stole the property. The text of the order fails to enlighten us, however, because it establishes only that Mullarkey attempted to raise his allegations of fraud. Nothing in the record suggests that the state court actually considered these allegations, let alone passed on them in denying the motion. Under New Jersey law, if the judgment of a court is based on one or more of several grounds, but does not expressly rely on any of them, none is conclusively established, in that another court subsequently reviewing that judgment cannot tell what issue or issues were fully adjudicated. *Ettin*, 251 A.2d at 287 (citation omitted).

Because this is the only information in the record that addresses what occurred in the New Jersey state court, we are

29

hesitant to conclude that either the Bankruptcy proceedings or the New Jersey state court proceedings bar consideration of Mullarkey's Complaint.

B.

The Bankruptcy Court alternatively relied on the New Jersey entire controversy doctrine to bar consideration of Mullarkey's Complaint. This doctrine

> requires that a person assert in one action all related claims against a particular adversary or be precluded from bringing a second action based on the omitted claims against that party. This reflects New Jersey's view that the "entire controversy, rather than its constituent causes of action, is the unit of litigation. A plaintiff must seek complete vindication of the wrong he charged."

*Melikian v. Corradetti*, 791 F.2d 274, 279 (3d Cir. 1986) (citations omitted). Under the entire controversy doctrine, a party cannot withhold part of a controversy for later litigation even when the withheld component is a separate and independently cognizable cause of action. *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 137 (3d Cir. 1999). The doctrine has three purposes: (1) complete and final disposition of cases through avoidance of piecemeal decisions; (2) fairness to parties to an action and to others with a material interest in it; and (3) efficiency and avoidance of waste and delay. *Id.* (citing

30

*DiTrolio v. Antiles*, 662 A.2d 494, 502 (N.J. 1995)). As an equitable doctrine, its application is flexible, with a case-by-case appreciation for fairness to the parties. *Id.* The entire controversy doctrine does not apply to bar component claims that are unknown, unarisen, or unaccrued at the time of the original action. *Mystic Isle Dev. Corp. v. Perskie & Nehmad*, 662 A.2d 523, 530 (N.J. 1995) (citations omitted).

As is reflected by our determination that Mullarkey's claim is a core matter, we find that it relates to conduct that was intrinsic to both the bankruptcy and foreclosure proceedings (which were occurring simultaneously). As Mullarkey characterizes it, "the prior proceeding itself [was] the alleged vehicle of the defendant's misconduct." In such an instance, it seems illogical and unfair to hold the prior proceeding preclusive of subsequent claims relating to that misconduct. *See, e.g.*, *K-Land Corp. No. 28 v. Landis Sewerage Auth.*, 800 A.2d 861, 868 (N.J. 2002) ("The entire controversy doctrine [is] an equitable preclusionary doctrine whose purposes are to encourage comprehensive and conclusive litigation determinations, to avoid fragmentation of litigation, and to promote party fairness and judicial economy and efficiency . . . .").

*Leisure Technology v. Klingbeil Holding Co.*, 349 A.2d 96 (N.J. Super. 1975), reiterates the importance of the entire controversy doctrine and confirms that it is applicable to foreclosure proceedings. However, it illustrates that the entire

31

controversy doctrine has a narrower application to foreclosure proceedings, extending only to "germane" counterclaims.[1] *Leisure Tech.*, 137 A.2d at 98–99. "The use of the word 'germane' in the language of the rule undoubtedly was intended to limit counterclaims in foreclosure actions to claims arising out of the mortgage transaction which is the subject matter of the foreclosure action." *Id.* In *Leisure Technology*, the trial judge had granted the plaintiff's motion to strike the defendant's first affirmative defense of fraudulent conduct on the part of the plaintiff. *Id.* at 97. Specifically, the defendant alleged that the plaintiff had breached the underlying agreement in relation to which the mortgage had been executed, thereby causing the defendant to be unable to make his mortgage payments. *Id.* In

---

[1] New Jersey Rule of Court 4:7-1 provides, in relevant part: "Except as otherwise provided by R. 4:64-5 (foreclosure actions) and R. 4:67-4 (summary actions), a pleading may state as a counterclaim any claim against the opposing party whether or not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim." In turn, R. 4:64-5, provides in part, "Unless the court otherwise orders on notice and for good cause shown, claims for foreclosure of mortgages shall not be joined with non-germane claims against the mortgagor or other persons liable on the debt. Only germane counterclaims and cross-claims may be pleaded in foreclosure actions without leave of court. Non-germane claims shall include, but not be limited to, claims on the instrument of obligation evidencing the mortgage debt, assumption agreements and guarantees."

32

addition, the judge also granted the plaintiff's motion to sever the defendant's counterclaim and transfer it to the Law Division. *Id.* On appeal, the superior court concluded that the trial judge took too narrow a view of the scope of permissible Chancery litigation. *Id.* at 98. The court noted that, "here the thrust of the counterclaim is the assertion that plaintiff had breached the underlying agreement in relation to which the mortgage was executed and interfered with defendants' rights under that agreement. In the usually understood sense of the word, these claims were germane to the foreclosure action." *Id.* at 99.

Because counterclaims in foreclosure proceedings must be "germane," and because germane claims are those "arising out of the mortgage transaction which is the subject matter of the foreclosure action," we are satisfied that the claims Mullarkey asserted then, and now, are not germane to the foreclosure proceeding. Indeed, Mullarkey does not contend that the Defendant's actions caused the default of his mortgage obligations. Rather, his claims are based on the actions and representations of the Tamboers during the bankruptcy proceedings.

Ultimately, given the nature of the case and the fact that Mullarkey proceeded pro se during much of it, it is difficult for us to discern what specific claims he is now alleging as compared to which claims he did and did not raise previously. More importantly, it is unclear if Mullarkey could have raised the present claims in foreclosure, i.e., whether they had accrued

at that time or were even justiciable. Because the entire controversy doctrine is an equitable principle under which the Court may exercise its judicial discretion based on the particular circumstances inherent in a given case, *Mystic Isle Dev. Corp.*, 662 A.2d at 529–30, we decline to apply the doctrine in this case. Indeed, the New Jersey courts in applying the entire controversy doctrine have displayed a heightened concern for pro se litigants, particularly in summary or non-traditional proceedings. *See, e.g.*, *Cafferata v. Peyser*, 597 A.2d 1101, 1104 (N.J.Super.A.D. 1991) ("It would obviously be counterproductive in the extreme were a preclusionary rule enforced in such a way as to penalize, without any concomitant benefit to the parties or to the system, a pro se litigant's participation in the small claims mediation process or other expedited processing mechanism. Such enforcement would convert the entire controversy doctrine from an equitable device into a trap for the unsuspecting. That is not its function.").

IV.

Finally, both parties agree that the District Court reviewed the wrong Bankruptcy order when it rejected Mullarkey's appeal of the Bankruptcy Court's four interlocutory orders.[1] Mullarkey initially appealed the orders to the

[1] The motions sought: 1) a discretionary change in venue to the district court; 2) joinder of Steven Kartzman (Mullarkey's former attorney) as a necessary party; 3) "a reference to a

34

Bankruptcy Court, and they were eventually transferred to the District Court where they were given civil action number 05-2010. On appeal, in an order bearing the same civil action number, the District Court referred to the appeal as "from an April 11, 2005 Order of the Bankruptcy Court dismissing a Complaint filed by Richard Mullarkey." Accordingly, on remand the District Court should consider the merits of Mullarkey's appeal of the Bankruptcy Court's denial of his four motions.

V.

Because the record before us counsels a conclusion that the Bankruptcy erred on the merits with respect to its holding that Mullarkey's claims are barred by various preclusion doctrines, we will reverse and remand to the District Court to consider the merits of Mullarkey's claims, as well as his appeal of the Bankruptcy Court's denial of his four motions.

---

prosecuting authority"; and 4) reconsideration of the order dismissing one of the defendants to his complaint.