CITY OF PLAINFIELD, PLAINTIFF-RESPONDENT, v. PUBLIC
SERVICE ELECTRIC AND GAS COMPANY,
DEFENDANT-APPELLANT.

Argued October 9, 1979—Decided March 10, 1980—
Rehearing Granted April 21, 1980—Decided June 5, 1980.

246

*Frank A. Sickinger* argued the cause for the appellant (*Frank A. Sickinger* and *Carl L. Sulzberger,* attorneys).

*David H. Rothberg* argued the cause for respondent (*Sachar, Bernstein, Rothberg, Sikora & Mongello,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

The issue presented by this case is whether the City of Plainfield can compel Public Service Electric & Gas Company (PSE&G) to continue to supply free lighting service to municipal buildings pursuant to a contract entered into in 1898. The utility contends that the contract is not enforceable because it violates the statutory prohibition against discriminatory and unreasonable rates and preferences, *L.*1911, *c.* 195, § 18, codified as amended (*L.*1930, *c.* 35, § 1) at *N.J.S.A.* 48:3–1 and 48:3–4. The municipality asserts, however, that its contractual rights cannot be altered or impaired because the contract was entered into prior to the enactment of that statutory prohibition. It relies primarily on a 1916 judicial decision, *Public Service Elec. Co. v. Board of Public Utility Comm'rs,* 88 *N.J.L.* 603 (E. & A.), which involved claims between these same parties concerning

the same contractual provision wherein it was determined that the City was entitled to prevail under the contract.

In July 1898 the City of Plainfield enacted an ordinance designating certain streets in the city along which the Plainfield Gas & Electric Light Company, the predecessor of PSE&G, could place and maintain poles and conduits for the distribution of electric service. In November 1898 the utility and municipality entered into a written agreement relating to the manner in which such service was to be furnished. This contract provided that so long as the utility uses city streets it shall "light by electricity, free of charge" certain designated municipal buildings as well as all other municipal buildings generally, including any to be owned or used by the City in the future.[1]

Pursuant to this provision of the contract, the utility furnished free electric lighting to several municipal buildings, some of which were acquired after 1898. In December 1913, however, Public Service Electric Company, successor to Plainfield Gas & Light Company, notified the City that it would discontinue lighting the City's buildings free of charge as of February 1, 1914. The utility believed that this action was required by the Public Utility Act of 1911, L.1911, c. 195, § 18, which provided that "[n]o public utility . . . shall [m]ake, impose or exact any unjust or unreasonable, unjustly discriminatory or unduly preferential . . . rate," id. § 18(a), or "[m]ake or give, directly or indirectly, any undue or unreasonable preference or advantage to any person or corporation or to any locality," id. § 18(d).

In response to this notification, Plainfield petitioned the Board of Public Utility Commissioners (the Board), asking that the utility be compelled to comply with the terms of the 1898 contract. The Board issued an order directing the utility to

---

[1]The agreement also provided that, at the City's option, the utility would light the streets and public places "at prices not in excess of the prices now paid" and "shall not at any time or times hereafter charge any person or persons, or corporation, within the limits of said City, any higher rates or prices for furnishing electric light than are at present charged by said Company." Plainfield apparently has made no attempt to require compliance with either of these provisions.

comply with the contract terms. The utility then filed suit to set aside the Board's order. The trial court ruled in favor of the utility, finding that, while the performance required by the contract had been made unlawful by the 1911 legislation, the Board nevertheless lacked statutory authority to order specific performance of contracts. *Public Service Elec. Co. v. Board of Public Utility Comm'rs*, 87 *N.J.L.* 128, 130–131 (Sup.Ct.1915).

Plainfield appealed to the Court of Errors and Appeals, which affirmed the lower court's judgment vacating the Board's order compelling specific performance of the 1898 contract. The City, nevertheless, prevailed in its legal contention under the decision of the Court of Errors and Appeals. While the Court confirmed the lower court's ruling that the Board's order was invalid because it had gone beyond its statutory powers in ordering specific performance of the 1898 contract, 88 *N.J.L.* at 608–609, it rejected the lower court's reasoning with respect to the applicability of the 1911 act, finding the legislation to be "entirely prospective and not at all retroactive," *id.* at 607.

Following that decision, the utility resumed, and has since continued to provide, free lighting service to a number of city-owned facilities. In September 1974 Plainfield notified PSE&G that three additional buildings should be included under PSE&G's contractual obligation to furnish free lighting. The utility rejected the request, maintaining that these three buildings did not fall within the 1898 contract. In addition, it questioned whether the contract could still be enforced with respect to any municipal buildings, even those then receiving free service. Since 1975 PSE&G has refused to furnish free service for the three buildings under the 1898 contract and the City has withheld payment of substantial portions of its electric lighting and power bills attributable to these three buildings.

Plainfield filed a complaint in Superior Court for declaratory judgment to determine whether PSE&G is required to provide free lighting service for the three additional buildings—a library, a youth center, and a museum—and, if so, whether the

City is entitled to a credit against future billings for the partial amount paid to PSE&G for lighting each of these buildings since it was acquired by Plainfield. PSE&G by answer denied that the three additional properties fall within the coverage of the 1898 contract, and further asserted that the provisions of the contract regarding free lighting service are illegal; it also filed a counterclaim asking the court to hold the agreement unenforceable. In answer to PSE&G's counterclaim, Plainfield pleaded the 1916 decision of the Court of Errors and Appeals as a bar to any attack on the enforceability of the 1898 contract.

The trial court ruled in favor of Plainfield on its complaint and on PSE&G's counterclaim, concluding that the three new facilities fell within the language and intent of the 1898 contract. It emphasized, however, that PSE&G's contractual obligations to provide free service extended only to electric *lighting*, not to *all* electric service. It found that the 1898 contract obligated PSE&G to furnish free lighting service for each of the three additional buildings. Because this obligation had not been met in the past, the court ruled that Plainfield would be allowed to make a claim against future billings for all sums previously paid to PSE&G for lighting each building since the date it had initially been occupied for municipal purposes. PSE&G filed a notice of appeal with the Appellate Division. In an unreported *per curiam* decision, that court affirmed the trial court's decision on the ground that the 1916 decision of the Court of Errors and Appeals was binding. This Court granted PSE&G's petition for certification. 79 *N.J.* 487 (1979).

I

The essential issue in the case is whether particular provisions of the Public Utility Act, *viz. N.J.S.A.* 48:3–1 and 48:3–4, should be applied to invalidate unjustly discriminatory utility rates or unreasonable preferences set by a contract between a public utility and a municipality entered into prior to the enactment of the Public Utility Act.

The Court of Errors and Appeals in the earlier litigation involving this same contract, as already noted, limited application of the act's prohibition against unjust discrimination and unreasonable preferences to rate arrangements entered into after the statute's date of enactment. 88 *N.J.L.* at 608. The primary ground for its decision was that the Board of Public Utility Commissioners had no authority to order the specific performance of the contract. The Court nevertheless did consider the application of the statute to antecedent contracts, noting that the language of the 1911 Act stated that no public utility "shall  .  .  .  make" any unjustly discriminatory or unduly preferential rates. It viewed this "verb phrase" as being "used to prohibit a contingent future event," and concluded that "[i]t is perfectly clear that the statute is without retroactive effect, and that it cannot operate upon the contract of 1898, which, concededly, was lawful when made." 88 *N.J.L.* at 608.

The soundness, as well as the necessity, of this reasoning is at best debatable. One may question whether the Court was actually confronted with a classic claim of retroactivity. The issue as to the application of the 1911 act should have been restricted to whether it would require nondiscriminatory rates for the utility service on a prospective basis, not whether such rates could be imposed and charged retrospectively against the municipality. Moreover, in other cases, the statute was not considered to be so "perfectly clear" as to its "retroactive" application. For example, one case decided by the Supreme Court before the decision in *Public Service Electric, supra*, applied section 18 of the 1911 act to a preexisting gratuity furnished by a common carrier. *Public Service Ry. Co. v. Bd. of Pub. Util. Comm'rs*, 85 *N.J.L.* 123, 125–126 (Sup.Ct.1913), aff'd o.b. 86 *N.J.L.* 696 (E. & A. 1914). And in *Lehigh Valley R.R. Co. v. United Lead Co.*, 102 *N.J.L.* 545, 549 (Sup.Ct.1926), a case decided after the Errors and Appeals decision in *Public Service Electric*, the court held that the provisions of a contract entered

into in 1904 violated the 1911 Public Utility Act's prohibition against unreasonable preferences and discriminatory practices, stating that "a promisor is excused from performance of a contract, lawful when made, when its performance is subsequently made unlawful." Similarly, the Chancery Court in *Schmoele v. Atlantic City R.R. Co.*, 108 *N.J.Eq.* 353, 356 (Ch. 1931), applied the 1911 act to void a contract entered into in 1877. The Court of Errors and Appeals, affirming on other grounds, 110 *N.J.Eq.* 597, 599–600 (1932), noted without reaching the issue that "[t]he vice-chancellor seems not to have given weight" to the earlier expression of the Court of Errors and Appeals in *Public Service Electric, supra*, that the 1911 act was "without retroactive effect" upon a lawful antecedent contract.

■ We are firmly of the view that the 1911 Public Utility Act, in its prohibition of unjustly discriminatory utility rates and unreasonable preferences, must be applied uniformly to all rates, including those set prior to the enactment of the statute. A disparate application, which would exempt discriminatory rates established prior to 1911, would frustrate totally the essential purpose of the act and cannot therefore be allowed.

This conclusion follows from the essential nature of the ratemaking process, which the Public Utility Act addresses. Rate regulation is a continuing, ongoing governmental function. It is necessarily undertaken in the context of contemporary circumstances. See, *e. g., Consumers Power Co. v. Michigan Public Serv. Comm'n*, 65 *Mich.App.* 73, 77, 237 *N.W.2d* 189, 190–191 (Ct.App.1975). Rates must be fixed, and their fairness and reasonableness evaluated, against the backdrop of current conditions. For that reason, in addition to their general applicability as quasi-legislative rulings, utility rates are accorded prospective effect. *In re Toms River Water Co.*, 82 *N.J.* 201 at 213–214 (1980) (provisional utility rate tariff not given retroactive effect); *In re Lambertville Water Co.*, 79 *N.J.* 449, 457 (1979); *In re Intrastate Industrial Sand Rates*, 66 *N.J.* 12, 23, 28 (1974); *In*

re *N.J. Power & Light Co.*, 15 *N.J.* 82, 92–93 (1954); see *Mars Hill & Blaine Water Co. v. Public Util. Comm'n*, 397 *A.2d* 570, 583 (Me.Sup.Jud.Ct.1979); *Valentine v. Michigan Bell Telephone Co.*, 388 *Mich.* 19, 25, 199 *N.W.2d* 182, 184–185 (Sup.Ct.1972); *Southwest Gas Corp. v. Public Serv. Comm'n*, 86 *Nev.* 662, 669, 474 *P.2d* 379, 383 (Sup.Ct.1970); *Mountain States Telephone & Telegraph Co. v. New Mexico State Corp. Comm'n*, 90 *N.M.* 325, 341, 563 *P.2d* 588, 604 (Sup.Ct.1977); *Friends of the Earth v. Public Serv. Comm'n*, 78 *Wis.2d* 388, 411–412, 254 *N.W.2d* 299, 308–309 (Sup.Ct.1977). It has been observed that

> it can hardly be that with changing circumstances those rates and practices would forever remain just and reasonable. We are admonished by present-day conditions that . . . old rates [may have become] unreasonably low, and . . . old practices [may have become] unjust to the public. And if the rates become unreasonable and the practices unjust, they would cease to be lawful. Unchangeable rates and practices are almost certain to become unlawful. [*Atlantic Coast Elec. Ry. Co. v. Bd. of Pub. Util. Comm'rs*, 92 *N.J.L.* 168, 175 (E. & A. 1918), app. dism. 254 *U.S.* 660, 41 *S.Ct.* 10, 65 *L.Ed.* 462 (1920).]

The command of *N.J.S.A.* 48:3–1 and 48:3–4 that utility ratemaking eliminate undue and unreasonable discrimination and improper preferences dictates the removal of discrimination with respect to all rates intended to have current and prospective effect whether or not such rates were fixed at some previous time. *Cf. Louisville & Nashville Railroad Co. v. Mottley*, 219 *U.S.* 467, 478, 31 *S.Ct.* 265, 269, 55 *L.Ed.* 297, 302 (1911) (congressional enactment affecting common carriers applied retroactively since its purpose was "to cut up by the roots every form of discrimination, favoritism, and inequality"). This conclusion is particularly compelling where, as here, the contractual rates or preferences purport to be indefinite in duration and, if unaltered, would inevitably become progressively unfair and distorted with the passage of time and changing circumstances.

## II

■ Related to the issue of whether the 1911 Public Utility Act can be applied to rate arrangements fixed by the 1898 contract is the question of whether such an application, rendering the contract unenforceable, would violate the contract clauses of the United States Constitution, *U.S.Const.*, Art. I, § 10, cl. 1, and our State Constitution, *N.J.Const.* (1947), Art. 4, § 7, par. 3. These clauses provide in nearly identical language that no law shall be passed "impairing the obligation of contracts." Although Plainfield does not raise the issue in these particular terms, its insistence that public policy precludes retroactive application of the statute on grounds that it would impermissibly impair the obligations created by the 1898 contract implicates this constitutional issue.

In *United States Trust Co. v. New Jersey*, 431 *U.S.* 1, 22, 97 *S.Ct.* 1505, 1517, 52 *L.Ed.*2d 92, 109 (1977), the Supreme Court recognized that, even where essentially private contracts are involved, a state "possess[es] broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from state regulation by making private contractual arrangements." See *E & E Hauling, Inc. v. Forest Preserve District*, 613 F.2d 675, 681 (7 Cir. 1980) (discussing *United States Trust* and noting that "[n]ot all impairments of contractual obligations are unconstitutional"); see generally Case Comment, "Repeal of Covenant Providing Security of Municipal Bond Violates Contract Clause," 31 *Rutgers L.Rev.* 786 (1978); Hurst, "Municipal Bonds and the Contract Clause: Looking Beyond *United States Trust Company v. New Jersey*," 5 *Hastings Const.L.Q.* 25 (1978); Case Comment, "Revival of the Contract Clause," 39 *Ohio St.L.J.* 195 (1978); Kraft & St. John, "The Contract Clause as the Guardian Against Legislative Impairment of Municipal Bondholders' Rights," 6 *Seton Hall L.Rev.* 48 (1974). The Supreme Court,

however, carefully drew a distinction between the impairment by a state of its own contractual obligations. 431 *U.S.* at 22–23, 97 *S.Ct.* at 1517–1518, 52 *L.Ed.*2d at 109–110. That distinction applies here, where the contract is not between two purely private entities but rather is between a governmental body and a quasi-public regulated entity such as the utility in this case.

In *Public Service Electric, supra,* the Court of Errors and Appeals reserved the question of "the state's power to impair or abrogate a contract to which a municipality or the public are parties." 88 *N.J.L.* at 608. However, in *Collingswood Sewerage Co. v. Collingswood,* 91 *N.J.L.* 20 (Sup.Ct.1918), aff'd 92 *N.J.L.* 509 (E. & A. 1918), this basic question was considered. The court determined that a sewerage company could petition the Board of Public Utility Commissioners for a rate increase despite a maximum rate established by a municipal ordinance which the utility had accepted. The court stated:

> The ordinance was the legislative act of the municipality. . . . It makes little difference whether we say that the ordinance created by way of legislative grant a property right called a franchise, protected by the fourteenth amendment, or a contract protected by the contract clause of the federal constitution and our own state constitution. In either case, the question is whether a municipal corporation, an agency of the state, is protected by either the fourteenth amendment or the contract clause. It is well settled that such protection does not extend to the rights of the municipal corporation against its own creator. [91 *N.J.L.* at 25–26.]

The Court of Errors and Appeals concurred in the reasoning of the court on this point. 92 *N.J.L.* at 510.

In *Atlantic Coast Elec. Ry. Co. v. Bd. of Pub. Util. Comm'rs, supra,* 92 *N.J.L.* at 173, the Court ruled that the Board of Public Utility Commissioners could order an increase in service of a common carrier even though at variance with the contractual rights created by ordinance, observing that the ordinance in effect

is a contract subject to the state's sovereign power over rates, and, when as in this case, the state through its board of public utility commissioners exercises its sovereign power over rates, the contract rights of the parties must yield.

In *Hackensack Water Co. v. Bd. of Pub. Util. Comm'rs*, 96 *N.J.L.* 184, 189–191 (E. & A. 1921), the Court affirmed the power of the Board to alter rates which had become unjust and discriminatory, even when those rates had been established by a contract entered into prior to the enactment of the Public Utility Act.[2] See *Bayonne v. Passaic Consol. Water Co.*, 98 *N.J.Eq.* 174 (Ch. 1925) (upholding Board order increasing rates despite an antecedent contract setting lower rates).

Other cases have uniformly recognized that a municipal corporation cannot invoke the protection of constitutional contract clauses against the abrogation of contracts by the state. See, *e. g., City of Trenton v. New Jersey*, 292 *U.S.* 182, 186–187, 43 *S.Ct.* 534, 536, 67 *L.Ed.* 937, 941 (1923); *Worcester v. Worcester Consol. Street Ry. Co.*, 196 *U.S.* 539, 548, 25 *S.Ct.* 327, 329, 49 *L.Ed.* 591, 595 (1905); *Alameda County v. Janssen*, 16 *Cal.*2d 276, 284, 106 *P.*2d 11, 15–16 (1940) (Traynor, J.); *Metropolitan Dev. & Housing Agency v. South Central Bell Telephone Co.*, 562 *S.W.*2d 438, 442 (Tenn.Ct.App.1977), *cert.* den. (Tenn.Sup.Ct.

---

[2]This case continued before the courts on the issue of a fair rate of return for the utility. 98 *N.J.L.* 41 (Sup.Ct.1922), aff'd o.b. 100 *N.J.L.* 177 (E. & A. 1924). In 1954 this Court partially overruled the *Hackensack Water* cases in *In re N.J. Power & Light Co., supra*, 15 *N.J.* at 86–94. See *In re Intrastate Indus. Sand Rates, supra*, 66 *N.J.* at 23. The specific feature of the cases to be so overruled was their allowing the utility "to recoup deficits in operations by temporary surcharges added to its regular rates." *In re N.J. Power & Light Co., supra*, 15 *N.J.* at 86. See *Hackensack Water, supra*, 98 *N.J.L.* at 44–45. The 1921 Errors and Appeals decision, dealing with the Board's power to alter any already existing rates regardless of their contractual origin, was thus not overruled by *In re N.J. Power & Light Co., supra*. Nor is the issue of recoupment of past deficits, that aspect of *Hackensack Water* actually overruled, an issue currently before this Court.

1978); see generally Annot., "Franchise provisions for free or reduced rates by public service corporations as contract protected from change under contract clause of Federal Constitution," 10 *A.L.R.* 499 (1921); 64 *Am.Jur.2d, Public Utilities,* § 105 at 634 (1972).

We conclude that the municipality has no constitutional basis for complaining that its contractual rights have been unlawfully impaired by the enforcement of the prohibitions of *N.J.S.A.* 48:3–1 and 48:3–4 as applied to the rate arrangements for electric service furnished by the utility as reflected in the 1898 contract.

## III

A further argument made by the municipality is that the issues in controversy cannot be adjudicated because they are barred under the doctrine of *res judicata.* It is asserted that since the earlier decision by the Court of Errors and Appeals in *Public Service Electric, supra,* involved the same parties and the identical contractual obligation at issue here, it serves to preclude this subsequent litigation.

The general rule regarding "issue preclusion" arising out of prior judgments was expressed by this Court in *Washington Tp. v. Gould,* 39 *N.J.* 527, 533 (1963), as follows:

> It is well-settled that where a judgment of a court of competent jurisdiction directly determines a right, question or fact distinctly put in issue, such judgment estops the parties or their privies from thereafter relitigating the same issue in a subsequent proceeding between them, regardless of its nature or form.

In *State v. Gonzales,* 75 *N.J.* 181, 186 (1977), it was stated that "[c]ollateral estoppel is that branch of the broader law of *res judicata* which bars relitigation of any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action." See *United*

*Rental Equip. Co. v. Aetna Life & Cas. Ins. Co.*, 74 *N.J.* 92, 101 (1977); *State v. Ingenito*, 169 *N.J.Super.* 524, 531 (App.Div. 1979); *Gareeb v. Weinstein*, 161 *N.J.Super.* 1, 15 (App.Div.1978). The general rule was formulated in the *Restatement (Second) of Judgments* § 68 at 1 (Tent. Draft No. 4, 1977) as follows:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

See generally Currie, *"Res judicata* : The Neglected Defense,*"* 45 *U.Chi.L.Rev.* 317 (1978); Note, *"Res judicata* : Cause vs. Common Law,*"* 22 *Loyola L.Rev.* 221 (1976).

There is some question as to whether the precise issue raised in this case, namely, the application of *N.J.S.A.* 48:3–1 and 48:3–4, constituted a specific ground for the decision in the 1916 *Public Service Electric* case. The parties disagree on this point. One difference centers on whether the Court in that decision "directly determined" this issue of asserted retrospectivity or, in the words of the Restatement, whether the determination was "essential to the judgment." *Restatement (Second) of Judgments, supra*, § 68 at 1. We need not quibble over this question. Broader considerations dictate that this issue be squarely confronted and that the prior adjudication of the issue, whether central or collateral to the earlier decision, should not preclude its reexamination today.

■ The ability of a court to readdress previously adjudicated issues may under appropriate circumstances be exercised despite the narrow confines of issue preclusion or *res judicata*. *Washington Tp. v. Gould, supra*, 39 *N.J.* at 533; *Lasasso v. Lasasso*, 1 *N.J.* 324, 328 (1949); *Restatement (Second) of Judgments, supra*, § 68.1(b), § 68.1(e) and comments thereon; see *Jackson v. DeSoto Parish School Board*, 585 *F.2d* 726, 729 (5 Cir. 1978); *Cloverlanes Bowl, Inc. v. Gordon*, 46 *Mich.App.* 518, 524, 208

N.W.2d 598, 602 (Ct.App.1973); *Williams v. Butler,* 76 *N.M.* 782, 783, 418 *P.2d* 856, 857 (Sup.Ct.1966); *Oakes Municipal Airport Auth. v. Wiese,* 265 *N.W.2d* 697, 701 (N.Dak.Sup.Ct.1978). This is especially true where, as in this case, the issue is purely one of law and a new determination is warranted to avoid inequitable administration of the law. *Restatement (Second) of Judgments, supra,* § 68.1(b) at 27.

▪ The fundamental issue in this case is legal—the interpretation and application of a regulatory statute. The enforcement or nonenforcement of this statute clearly implicates the proposition that the law is now being inequitably administered. Thus, a contract setting unreasonable preferences—as here, free utility service for a particular municipality—is patently inequitable as to like consumers, if not rectified under a proper administration of the law. In addition, there is a potential adverse impact upon the public interest which itself demonstrates a convincing need for a new determination of the issue. *Restatement (Second) of Judgments, supra,* § 68.1(e) at 28. The parties here are not truly private in character. The interests of the public are involved in this litigation in light of the special status of the litigants, respectively, a municipal governmental body and a quasi-public regulated utility. Moreover, the broader interest of the public is affected by virtue of the inescapable impact of this litigation upon the proper exercise by the Board of Public Utility Commissioners of its statutory powers under *N.J.S.A.* 48:3–1 and 48:3–4. *Cf. Hackensack v. Winner,* 82 *N.J.* 1, 30–31, 1160–1161 (1980) (public interest is involved in all administrative agency proceedings).

We therefore conclude that the earlier decision of the Court of Errors and Appeals in *Public Service Electric, supra,* should not serve to preclude consideration and adjudication of the issue as to the proper application of *N.J.S.A.* 48:3–1 and 48:3–4.

## IV

For the reasons expressed, the contract between the parties compelling the utility to furnish electric lighting service to Plainfield's municipal buildings without charge is invalid and unenforceable as contrary to *N.J.S.A.* 48:3–1 and 48:3–4. PSE&G is entitled to assert its claim for payment for this electric service at appropriate rates for such service.

■ Prior to today's overruling of the 1916 decision, that decision, which upheld the validity of the 1898 contract, was binding on the parties. The failure of Plainfield to pay for the electric lighting service for all of its buildings was therefore justified under the law that was applicable until today's determination. The legal justificaton for that course of action, however, has now been removed by this decision. Under those circumstances and upon the City of Plainfield's application for rehearing, the Court's holding will be given prospective effect only and, therefore, PSE & G's claims for payment for electric lighting service provided to Plainfield will be allowed in the future as of the date of the original decision of this Court.

Accordingly, the judgment is reversed.

*For reversal*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER —6.

*For affirmance*—None.