FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER

Electronically Filed
Intermediate Court of Appeals
28853
31-MAY-2011
08:19 AM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


---o0o---


In the Matter of the

PUBLIC UTILITIES COMMISSION

Instituting a Proceeding to Investigate Whether Act 59,
Session Laws of Hawaii 1974, Invalidates, Voids, or
Renders Unenforceable the 1961 Agreement Between the
Trustees Under the Will and of the Estate of
Bernice P. Bishop, Deceased; Kaiser Hawaii Kai
Development Co.; and the City and County of Honolulu


NO. 28853


APPEAL FROM THE PUBLIC UTILITIES COMMISSION
(DOCKET NO. 2006-0021)


MAY 31, 2011


FOLEY, PRESIDING JUDGE, FUJISE AND LEONARD, JJ.


OPINION OF THE COURT BY LEONARD, J.

Respondent/Cross-Appellant State of Hawaiʻi (**State**) cross-appeals[1] from the February 1, 2006 Order No. 22254 (**Order No. 22254**) and the October 16, 2007 Decision and Order No. 23725 (**Order No. 23725**) entered by Petitioner/Cross-Appellee Public Utilities Commission of the State of Hawaiʻi (**the Commission or PUC**) in an administrative proceeding.[2]

In Order No. 22254, the Commission initiated an investigation to determine whether Act 59 of the 1974 Session Laws of Hawaii (**Act 59**) "invalidates, voids, or renders unenforceable," a 1961 agreement entered into by and between the Estate of Bernice P. Bishop, deceased (**Bishop Estate**), Kaiser Hawaii Kai Development Co. (**Kaiser**), and the City and County of Honolulu (**City**), whereby Kaiser agreed to provide certain sewerage services, including service to area schools and parks, to the City at no charge (**1961 Agreement**). Respondent/Cross-Appellee Hawaii-American Water Company (**HAWC**) is Kaiser's successor-in-interest and the current owner and operator of the subject sewerage system (**Sewerage System**). In 1965, the State assumed responsibility for all public schools in Hawaiʻi. Therefore, the State is the City's successor-in-interest with respect to the four schools served by the Sewerage System.

As discussed in this Opinion, in Order No. 23725, the Commission determined that the "rates" established by the 1961 Agreement are unenforceable and unlawful to the extent that they conflict with HAWC's tariff filed with and approved by the Commission and that all of HAWC's customers must pay the tariff

---

[1]    The City & County of Honolulu filed a notice of appeal, prior to the State's filing of the cross-appeal. However, the City's appeal was later dismissed with prejudice, pursuant to a stipulation of the parties.

[2]    As to Order No. 22254, the Commission was comprised of Chairman Carlito P. Caliboso, Commissioner Janet E. Kawelo, and Commissioner Wayne H. Kimura, who was excused. As to Order No. 23725, the Commission was comprised of Chairman Carlito P. Caliboso, Commissioner Leslie H. Kondo, and Commissioner John E. Cole, who was excused.

rates approved by the PUC. In this appeal, the State challenges the Commission's decision on various grounds. We affirm.

I. BACKGROUND

A. General Background

The Commission is an agency statutorily authorized to supervise and regulate public utilities, including, *inter alia*, the authority to investigate public utility companies and to approve increases to public utility rates. See Hawaii Revised Statutes (**HRS**) §§ 269-6, 269-15, 269-16 (2007). HAWC is a regulated entity that provides its sewerage services to numerous customers, including the State.

In the early 1960s, Kaiser developed certain real property which was owned by Bishop Estate and located on the eastern side of Oahu in the area now generally known as Hawai'i Kai. The 1961 Agreement was executed in connection with this development.

At the time of the 1961 Agreement, private sewer companies were not considered "public utilities" subject to Commission regulation as defined under (former) Revised Laws of Hawai'i §§ 104-1 (Supp. 1961), 104-5 (1955). In 1974, in Act 59, the Legislature expanded the definition of "public utility" to include private sewer companies. See 1974 Haw. Sess. L. Act 59, § 2 at 110. The relevant statutory text, which has remained materially unaltered since 1974, now provides:

> § 269-6. General powers and duties. (a) The public utilities commission shall have the general supervision hereinafter set forth over all public utilities, and shall perform the duties and exercise the powers imposed or conferred upon it by this chapter.
>
>  . . . .
>
> § 269-1. Definitions.
>
>  . . . .

"Public utility":

(1) Includes every person who may own, control, operate, or manage . . . any plant or equipment . . . for public use, for . . . the disposal of sewage; provided that the term shall include:

(A) Any person insofar as that person owns or operates a private sewer company or sewer facility. . . .

Accordingly, Act 59 subjects HAWC to Commission regulation.

From 1961 to 2004, HAWC or one of its predecessors provided the City or the State with free sewerage service to four schools in Hawaiʻi Kai.

B.    Procedural History

1.    Docket 03-0025 and the 2004 Tariff

In 2003, HAWC initiated a rate increase application with the Commission in Docket No. 03-0025. HAWC and the Consumer Advocate were the only parties.[3/]

In the course of the proceeding, the Consumer Advocate recommended that the Commission, in calculating HAWC's prospective sewerage rates, impute revenue to HAWC in an amount equal to the compensatory value of the free sewerage services provided to the State and City under the 1961 Agreement (**the Facilities Credit**). The Consumer Advocate's testimony included:

---

[3/]    Pursuant to HRS § 269-51 (2007) and Hawaii Administrative Rules (**HAR**) § 6-61-62 (1992), the Consumer Advocate represents the consumer and may participate as an *ex officio* party in Commission proceedings. See, e.g., In re Hawaiian Elec. Co., Inc., 5 Haw. App. 445, 446 n.1, 698 P.2d 304, 306 n.1 (1985). Those sections respectively provide, in relevant part, that:

§ 269-51. **Consumer advocate; director of commerce and consumer affairs.** The director of commerce and consumer affairs shall be the consumer advocate in hearings before the public utilities commission. The consumer advocate shall represent, protect, and advance the interests of all consumers, including small businesses, of utility services.

§ 6-61-62. **Consumer advocate.** (a) The consumer advocate is, ex officio, a party to any proceeding before the commission. . . .

>       Furthermore, the [1961 Agreement] required the sewer
> company to serve "[a]ll City facilities, meaning but not
> limited to schools and parks, hereafter established within
> the area...shall be served by the sewerage system at no
> expense to the City."
>
>       In order to ensure that taxpayers do not bear
> higher costs as a result of the [1961 Agreement]
> requiring these facilities to be served for a non-
> compensatory fee, the Commission has allowed in
> previous rate cases, the inclusion of a facilities
> credit in the calculation of [HAWC's] revenue
> requirement.  This facilities credit reduces the
> additional revenue requirement with revenues that
> would have been received if these facilities had been
> charged compensatory rates for the service provided.
> Therefore, the imputed revenues for this docket will
> differ from the actual revenues that will be collected
> based on the [1961 Agreement], which is based on a
> proportion of operating costs.
>
>                 . . . .
>
>       The estimated wastewater for these facilities is
> 27,456 thousand gallons.  Multiplied by the $6.22 non-
> restaurant rate per thousand gallons results in an imputed
> revenue of $170,776 for the facilities credit.

In a stipulated settlement agreement with the Consumer Advocate (**Settlement Agreement**), HAWC ultimately agreed to the proposed Facilities Credit while expressing its intent to seek, in a separate proceeding, *actual* compensation for the services rendered to the City and the State.

In May of 2004, the Commission approved HAWC's rate increase application.  Shortly thereafter, HAWC filed a tariff with the Commission, effective May 6, 2004, which reflected the newly-approved sewerage rates (**the 2004 Tariff**).  Generally stated, tariffs are "public documents setting forth services being offered; rates and charges with respect to services; and governing rules, regulations, and practices relating to those services."  In re Waikoloa Sanitary Sewer Co., Inc., 109 Hawai'i 263, 271, 125 P.3d 484, 492 (2005) (internal quotation marks, citations, and brackets omitted).

The State is not challenging the Commission's underlying rate calculations or the approval of the 2004 Tariff.

2. The Circuit Court Proceedings

In 2004, HAWC filed two actions in the Circuit Court of the First Circuit (**Circuit Court**): (1) Civil No. 04-1-2138-11, initiated against defendants Hawaii Kai Dunhill IDG Limited Partnership and Dunhill Hawaii Management LLC (**together, the Shopping Center**) for damages arising from alleged unpaid sewerage fees (**the Shopping Center Litigation**); and (2) Civil No. 04-1-2243-12 and Civil No. 04-1-2244-12, respectively initiated against the State and City for declaratory relief and damages arising from alleged unpaid sewerage fees (**together, the State and City Litigation**).

In the Shopping Center Litigation, HAWC sought unpaid sewerage fees from the Shopping Center for services rendered under both a 1991 tariff and the 2004 Tariff. On August 4, 2005, the Circuit Court granted HAWC's motion for summary judgment as to liability, but postponed its adjudication of damages. The Shopping Center argued that the damages awarded to HAWC should be offset by a "landscaping credit" included in the 2004 Tariff, but excluded in the 1991 tariff.

On October 12, 2005, the Circuit Court invited the Commission to submit an *amicus curiae* brief regarding the Shopping Center's claimed entitlement to the landscaping credit for sewerage services rendered *prior* to the 2004 Tariff. On January 20, 2006, the Commission filed an *amicus curiae* brief (**Amicus Brief**) which concluded that "[a]llowing the recovery of offsets for landscaping credits prior to [the 2004 Tariff] would effectively modify the terms of the [1991 tariff]," and accordingly, was precluded under the filed-rate doctrine.

The State and City Litigation, which turns on the enforceability of the 1961 Agreement, was stayed in 2005, by stipulation, pending the Commission proceedings discussed below.

6

### 3. The Commission Proceedings

#### a. Docket 05-0140

On June 7, 2005, HAWC filed a petition in PUC Docket No. 05-0140 seeking a declaratory order from the Commission that: (1) the rates set forth in the 1961 Agreement were unenforceable in light of the duly-approved 2004 Tariff; and (2) the State and City were obligated to pay past arrears and future sewerage fees in conformity with the 2004 Tariff. On June 23, 2005, the Commission entered Order No. 21888 which denied HAWC's petition and closed Docket No. 05-0140, while also expressing the Commission's future intent to evaluate the enforceability of the 1961 Agreement in a separate proceeding.

#### b. Docket 2006-0021

On February 1, 2006, the Commission entered Order No. 22254 which: (1) formally initiated Docket No. 2006-0021 in order to determine the enforceability of the 1961 Agreement; (2) named HAWC, the City, and the Consumer Advocate as parties; (3) invited other interested parties to file a motion to intervene; and (4) required all parties, including intervenors, to file a stipulated procedural order to govern the proceedings.[4] Thereafter, the

---

[4] The Commission initiated Docket No. 2006-0021 pursuant to, *inter alia*, HRS §§ 269-7, 269-15, and 269-16 (2007). Those statutory sections respectively provide, in relevant part:

> **§ 269-7. Investigative powers.** (a) The public utilities commission and each commissioner shall have power to examine into the condition of each public utility...the fares and rates charged by it...and all its financial transactions...its compliance with all applicable state and federal laws...and all matters of every nature affecting the relations and transactions between it and the public or persons or corporations.
>
> . . . .
>
> **§ 269-15. Commission may institute proceedings to enforce chapter.** (a) If the public utilities commission is of the opinion that any public utility or any person is violating or neglecting to comply with any provision of this chapter or of any rule, regulation, order, or other requirement of the commission...or that any rates, fares,
> (continued...)

State intervened.

On April 6, 2006, HAWC filed its Position Statement, arguing that "[u]nder HRS Chapter 269 and the filed-rate doctrine . . . HAWC is not only entitled to collect the amounts contained in the [2004 Tariff], but HAWC is actually required to do so, as providing service on different terms or at different rates would be unlawful."  HAWC further contended that "the rates, formulas, and [free service provision] contained in the 1961 Agreement are not enforceable and that all of HAWC's customers must pay the rates provided in the [2004 Tariff] filed with the [Commission]."

On May 1, 2006, the State filed its Position Statement, arguing that:  (1) the 2004 Tariff did not specifically reference or abrogate the 1961 Agreement, and to that end, the free service provision should be properly characterized as a fixed cost of HAWC; and (2) the State received inadequate notice of HAWC's intention to challenge the 1961 Agreement.  The State further argued, "[i]n regard to the public interest considerations:"  (1) if the Commission were to declare the 1961 Agreement

_____

4/(...continued)
     classifications, charges, or rules are unreasonable or
     unreasonably discriminatory, or that in any way it is doing
     what it ought not to do, or not doing what it ought to do,
     it...may institute such proceedings before it as may be
     necessary to require the public utility or the person to
     correct any such deficiency. . . .

     . . . .

     **§ 269-16.  Regulation of utility rates; ratemaking
     procedures.**  (a)  All rates, fares, charges,
     classifications, schedules, rules, and practices made,
     charged, or observed by any public utility . . . shall be
     just and reasonable and shall be filed with the public
     utilities commission. . . .

     (b)  No rate, fare, charge, classification, schedule, rule,
     or practice, other than one established pursuant to an
     automatic rate adjustment clause previously approved by the
     commission, shall be established, abandoned, modified, or
     departed from by any public utility, except after thirty
     days' notice to the commission as prescribed in section
     269-12(b), and prior approval by the commission for any
     increases in rates, fares, or charges. . . .

unenforceable, future utility companies would have difficulty obtaining necessary building and use permits; and (2) if the Commission were to declare the 1961 Agreement unenforceable, the City could potentially purchase the Sewerage System for $1.00 under the terms of the 1961 Agreement.

On May 15, 2006, HAWC replied to the State's position, reiterating HAWC's interpretation of the filed-rate doctrine and attaching, amongst other things, the Amicus Brief.

On October 16, 2007, the Commission entered Order No. 23725, concluding that: (1) the rates established under the 1961 Agreement were unenforceable to the extent that those rates conflicted with the 2004 Tariff; and (2) all HAWC customers, including the State, must pay the rates embodied in the 2004 Tariff. Order No. 23725 provides, *inter alia*, a discussion of the factual and legal grounds for the PUC's decision, including the following excerpts (footnotes omitted):

> State law confers the supervision and regulation of "all public utilities" and the administration of HRS chapter 269 on the commission. The definition of a "public utility in HRS § 269-1 was amended in 1974 through Act 59 to include private owners and operators of sewer facilities. . . . HAWC provides wastewater collection, treatment, and disposal services in the Hawaii Kai area and, thus, is a public utility under the commission's jurisdiction subject to, by law, the provisions set forth in HRS chapter 269. In particular, HRS § 269-16 sets forth the parameters for the regulation of utility rates and ratemaking. . . .
>
> . . . .
>
> Upon review, the commission finds the rates of the 1961 Agreement to be unenforceable and unlawful to the extent that they conflict [with] HAWC's [2004 Tariff]. The provisions of HRS § 269-16 are clear: all rates, fares, charges, classifications, schedules, rules, and practices made, charged, or observed by any public utility must be filed with and approved by the commission. HAWC's [2004 Tariff] filed with and approved by the commission does not mention the provisions of the 1961 Agreement. Additionally, as explained by HAWC, under the filed rate doctrine, once approved by a regulatory agency, the tariff of a public utility is considered to be the law with respect to the service provided and the public utility may not charge rates that are different from the tariff. The Hawaii Supreme Court made clear in <u>Balthazar v. Verizon Hawaii, Inc.</u>, 109 Hawai'i 69, 77, 123 P.3d 194, 202 (2005) ("<u>Balthazar</u>"), that the filed rate doctrine is applicable in a case involving a

public utility subject to the commission's jurisdiction.
Thus, the 1961 Agreement which provides for free sewer
services to all City facilities in Hawaii Kai and rates
based on a certain formula for the Portlock and Related
Areas is unenforceable and unlawful.

HAWC's argument that the 1961 Agreement was subject to
the exercise of the State's police power to regulate sewer
services through the passage of the 1974 Amendment, and that
the rates set forth in the 1961 Agreement were abrogated
through the application of the filed rate doctrine when the
commission approved tariffs which conflicted with the 1961
Agreement rates is sound, and is based on reliable case
authority. As HAWC maintains, the Hawaii Supreme Court
states in Molokoa Village [Dev. Co., Ltd. v. Kauai Elec. Co.
Ltd., 60 Haw. 582, 593 P.2d 375 (1979),] that "[i]t is well
established that a public utility can enforce payment for
its services in accordance with its established tariff,
notwithstanding any agreement to charge less." Aside from
relying on Molokoa Village and countless other cases, HAWC
asserts that the matters of this case is similar to that of
a 1980 New Jersey case wherein the supreme court in that
state "held that even rates set between the utility and city
prior to the statute's enactment are subject to the new
statutory scheme." Akin to this case, among other things,
the agreement in question in Plainfield [v. Public Serv.
Elec. & Gas Co., 82 N.J. 245, 412 A.2d 759 (1980)]: (1) was
entered into between a utility and a municipality; (2)
involved the provision of free utility service for municipal
facilities for use of city property in the provision of
utility service; and (3) was entered into prior to the
enactment of the relevant state statute. Thus, the
commission finds the application of the holding in
Plainfield to the matters of this case to be appropriate. .
. .

In contrast, the arguments presented by the City and
the [State] in their respective position statements are
unpersuasive, erroneous, and inapplicable. . . .

[The State's] implication that the 1961 Agreement is
an impact fee, and argument that it was provided no notice
of the abrogation of the agreement since there is no
reference of it made in the tariff is immaterial. As HAWC
correctly states, HAWC is required to charge and collect
sewer fees pursuant to the tariff rates for its customer
classes, and thus the rates of the 1961 Agreement cannot
stand. Similarly, the timing of HAWC's decision to collect
the sewer fees attributable to the facilities of the City
and the [State] is also irrelevant since the 1961 Agreement
became legally unenforceable with the regulation of sewer
companies and the resulting affect of the filed rate
doctrine. Moreover, continuing to apply rates pursuant to
the 1961 Agreement would be a violation of HRS § 269-16.

[The State's] claim that a commission determination
that the 1961 Agreement is void or unenforceable would
trigger Section 9 of the agreement and, thus, allow the City
to purchase the Sewerage System for $1.00 appears to be
inaccurate since Section 9 of the [1961 Agreement] would

only be triggered if the owner and operator of the system intends to <u>abandon</u> its operations and ownership. HAWC assures the commission that this is not the case, and elaborates that it fully intends to continue providing services to all of its customers.

[The State's] contention that HAWC would not have an independent claim to provide sewer services in the Hawaii Kai area without the 1961 Agreement is also inaccurate. As HAWC correctly states, while the [State's] allegation would have been proper prior to 1974, due to the change in the law and the regulation of sewer companies by the commission through passage of Act 59, the commission, under Chapter 269, HRS, and not the 1961 Agreement authorizes HAWC to provide sewerage services in the Hawaii Kai area.

Finally, the [State's] request that the commission find that the 1961 Agreement is a necessary operating cost of HAWC; or, in the alternative, should deduct the cost [of] the 1961 Agreement from whatever profits the commission allows the utility is not sufficiently supported. Under the circumstances, it is questionable whether such a finding by the commission would be "just and reasonable" and in the public interest. The [State] in its position statement did not fully elaborate on why the commission should grant its request and how grant of its request is just and reasonable in the public interest. Additionally, the [State] did not satisfactorily counter HAWC's arguments regarding the applicability of the filed rate doctrine and HAWC's obligation under the doctrine and HRS chapter 269 to collect the rates set forth in its approved tariff.

The principles that underlie the filed rate doctrine are: (1) preventing price discrimination and ensuring all customers pay the same rates; and (2) preserving the regulatory agency's exclusive role in approving rates and to ensure that the filed rates are the exclusive source of the terms and conditions by which the utility provide services to its customers. These principles are well-established and in the public interest.

Based on the foregoing, the commission concludes that the rates established by the 1961 Agreement are unenforceable and unlawful to the extent that they conflict with HAWC's tariff filed with and approved by the commission. Additionally, the commission further concludes that all of HAWC's customers must pay rates set forth in tariffs filed with and approved by the commission.

. . . .

THE COMMISSION ORDERS:

1. The rates established by the 1961 Agreement are unenforceable and unlawful to the extent that they conflict with HAWC's [2004 Tariff] filed with and approved by the commission.

2. All of HAWC's customers must pay rates set forth in the tariffs filed with and approved by the commission.

On November 15, 2007, the City timely filed a notice of appeal from Order No. 23725, and on November 27, 2007, the State timely filed a cross-appeal. The City's appeal was dismissed by stipulation on July 8, 2008.

II. POINTS OF ERROR

The State raises the following points on appeal:

(1) The Commission erred in concluding that: (a) the rates established by the 1961 Agreement are unenforceable to the extent that they conflict with the 2004 Tariff, and (b) all HAWC customers, including the State, must pay sewerage rates set forth in the 2004 Tariff;

(2) The Commission erred in failing to address public interest considerations in Order No. 23725, although, in Order No. 22254, it specifically identified public interest considerations as an issue in its investigation;

(3) In holding that the filed-rate doctrine invalidated the 1961 Agreement, the Commission erred in failing to apply the heightened standard applicable when the State's exercise of its police powers interferes with its own contractual obligations; and

(4) The Commission erred in Order No. 22254 by failing to disclose the Amicus Brief filed in the Shopping Center Litigation.

III. STANDARDS OF REVIEW

The construction of a tariff is a question of law, reviewed on appeal under the right/wrong standard. See In re Waikoloa Sanitary Sewer Co., Inc., 109 Hawai'i at 270, 125 P.3d at 491 (in examining filed-rate doctrine as applied to sewerage tariff filed with Commission, concluding that "we treat the construction of a tariff as a question of law") (citing Balthazar v. Verizon Hawaii, Inc., 109 Hawai'i 69, 73, 123 P.3d 194, 198 (2005)).

In civil cases, the plain error rule is only invoked when "justice so requires." Montalvo v. Lapez, 77 Hawai'i 282, 290, 884 P.2d 345, 353 (1994) (citation omitted). To that end, "[i]f the substantial rights of a party have been affected adversely, the error will be deemed plain error." Shanghai Inv. Co., Inc. v. Alteka Co., Ltd., 92 Hawai'i 482, 492, 993 P.2d 516, 526 (2000) (citation omitted). Within this context, the Hawai'i Supreme Court has stated that:

> [T]he appellate court's discretion to address plain error is always to be exercised sparingly. . . . And, indeed, in civil cases, we have taken three factors into account in deciding whether our discretionary power to notice plain error ought to be exercised: (1) whether consideration of the issue not raised at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's findings of fact; and (3) whether the issue is of great public import.

Okada Trucking Co., Ltd. v. Bd. of Water Supply, 97 Hawai'i 450, 458, 40 P.3d 73, 81 (2002) (citation and brackets omitted); see also Liftee v. Boyer, 108 Hawai'i 89, 98-99, 117 P.3d 821, 830-831 (App. 2004) (declining invocation of plain error doctrine where one of three Okada factors not satisfied).

IV. DISCUSSION

A. The Filed-Rate Doctrine

The Hawai'i Supreme Court has adopted the following articulation of the filed-rate doctrine, which initially arose in the context of the Interstate Commerce Act:

> **The rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext.** Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable.
>
> Shippers and carriers were thus bound under the doctrine to the rate set forth in the duly filed tariff and were prevented from invoking common-law claims and defenses such as ignorance, estoppel, or prior agreement to establish a rate different from the tariff rate.
>
> The filed-rate doctrine was eventually applied beyond the interstate transportation industry, extending across the spectrum of regulated utilities, with the twin aims of (1) preventing service or rate discrimination among consumers

and (2) preventing courts from intruding upon the rate-making authority of federal agencies.

Balthazar, 109 Hawaiʻi at 73, 123 P.2d at 198 (emphasis in the original; citations and internal quotation marks deleted; format altered).

The Commission is a regulatory agency statutorily authorized to supervise "public utilities," as defined under HRS § 269-1. See HRS § 269-6. HRS § 269-16 provides:

> **§ 269-16. Regulation of utility rates; ratemaking procedures.** (a) All rates, fares, charges, classifications, schedules, rules, and practices made, charged, or observed by any public utility...shall be just and reasonable and shall be filed with the public utilities commission. . . .
>
> (b) No rate, fare, charge, classification, schedule, rule, or practice, other than one established pursuant to an automatic rate adjustment clause previously approved by the commission, shall be established, abandoned, modified, or departed from by any public utility, except after thirty days' notice to the commission as prescribed in section 269-12(b), and prior approval by the commission for any increases in rates, fares, or charges. . . .

Thus, HRS § 269-16 "expressly empowers the [Commission] to fix rates, charges and practices of any public utility and to prohibit rebates and unreasonable discrimination between users and customers." Balthazar, 109 Hawaiʻi at 78, 123 P.3d at 203 (internal quotation marks and citation omitted). The Hawaiʻi Supreme Court has interpreted HRS § 269-16 as requiring that a public utility's "[r]ates and charges . . . be filed with the [Commission] and . . . not be departed from except on prior approval of the [Commission]." Id. (quoting Molokoa Village Dev. Co., Ltd. v. Kauai Elec. Co., Ltd., 60 Haw. 582, 586, 593 P.2d 375, 379 (1979)).

Accordingly, and within the specific context of the Commission's rate-making authority, the Hawaiʻi Supreme Court has expressly adopted the filed-rate doctrine. See In re Waikoloa Sanitary Sewer Co., Inc., 109 Hawaiʻi at 271-72, 125 P.3d at 492-93 (applying filed-rate doctrine to sewerage service tariff);

14

Balthazar, 109 Hawai'i at 72-73, 82, 123 P.3d at 197-98, 207. This doctrine, also known as the filed-tariff doctrine, "essentially prohibits a regulated entity from charging rates for its services that differ from the rates filed with the appropriate federal [or state] regulatory agency." Balthazar, 109 Hawai'i at 72, 123 P.3d at 197 (citation omitted). The supreme court has recognized that application of the doctrine "may appear harsh" but that adherence to the doctrine is necessary in order to advance the goals of "promoting nondiscrimination and non-justiciability." Id. at 73, 123 P.3d at 198 (citation omitted).

Pursuant to the doctrine, "filed tariffs govern a utility's relationship with its customers and have the force and effect of law until suspended or set aside." Waikoloa Sanitary Sewer Co., Inc., 109 Hawai'i at 271, 125 P.3d at 492 (internal quotation marks and citations omitted). Therefore, "where a tariff is unambiguous the parties are bound by its terms." Id. at 273, 125 P.3d at 494 (citation omitted). Given these principles, "a public utility can enforce payment for its services in accordance with its established tariff, notwithstanding any agreement to charge less." Balthazar, 109 Hawai'i at 76, 123 P.3d at 201 (quoting Molokoa, 60 Haw. at 587, 593 P.2d at 379).

Additionally, "notice of the terms and rates established in a filed tariff is imputed to customers." Waikoloa Sanitary Sewer Co., Inc., 109 Hawai'i at 272, 125 P.3d at 493 (internal quotation marks and citations omitted). Thus, "[i]gnorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed," and "even a carrier's intentional misrepresentation will not bind the carrier to its promised rate if the promise contradicts the rate established in the published tariff." Balthazar, 109 Hawai'i at 73, 123 P.3d at 198 (internal quotation marks and citations omitted, brackets in original). Moreover, "neither the tort of the carrier nor the

existence of a contract will work to vary or enlarge the rights defined in a tariff."  Id. (citation omitted).

B.   The Application of the Filed-Rate Doctrine

Here, the State argues that the Commission erred in concluding that the rates set forth in the 1961 Agreement are unenforceable, to the extent they conflict with the 2004 Tariff. However, this matter falls squarely within the filed-rate doctrine because:  (1) HAWC is a regulated public utility whose 2004 Tariff was duly filed with and approved by the Commission; (2) the State is a HAWC sewerage customer; (3) the 2004 Tariff sets the rates for all HAWC sewerage customers; (4) the application of the 2004 Tariff rates to the State conflict with the free services provision in the 1961 Agreement; and (5) the filed-rate doctrine prohibits any deviation or exceptions to the rates of a regulated utility once the rates have been approved and filed by the regulatory agency, notwithstanding any prior agreement to the contrary.

The State argues on appeal that the Commission erred because, in approving the 2004 Tariff, the Commission did not approve rates that conflicted with the 1961 Agreement.  More specifically, the State argues that the 2004 Tariff was based on and incorporated the "concept" of HAWC continuing to provide free service to the State; therefore, the State argues, there is no conflict between the 2004 Tariff and the free services provision in the 1961 Agreement.  Granted, in the Settlement Agreement between HAWC and the Consumer Advocate, HAWC agreed to the Facilities Credit, which imputed income to HAWC in the amount that HAWC would have received had the State (and City) paid for their sewerage services.  However, HAWC did so while openly expressing its intent to seek actual compensation from the State for those sewerage services, in light of the imputed revenue.  Thus, the State overstates the helpfulness of these concepts to its argument.

In any case, the free services provision in the 1961 Agreement plainly conflicts with the 2004 Tariff. Under the 1961 Agreement, HAWC is required to provide the State with certain sewerage services at no charge. Pursuant to the 2004 Tariff, HAWC is required to charge all sewerage customers, which indisputably includes the State, a particular rate for sewerage services. In other words, regardless of how or why the 2004 Tariff rates were set, the contractual provision in the 1961 Agreement relieving the State of any payment obligation plainly and unambiguously differs from the payment obligation under the 2004 Tariff. Such a result is prohibited under the filed-rate doctrine, which specifically rejects the enforcement of a promised contract rate that contradicts a published tariff rate. See Balthazar, 109 Hawai'i at 73, 123 P.3d at 198.

C.   Public Interest Considerations

The State argues, erroneously, that the Commission "entirely and inexplicably omits any consideration of the public interest considerations that preserve the validity of the 1961 Agreement." The State's misapprehension is most likely related to the fact that the "public interest consideration" that the State now asks this court to consider on appeal was not raised in the proceeding before the Commission. As noted above, in response to the Commission's express statement, in Order No. 22254, that an issue for investigation was "the public interest considerations" related to potential unenforceability of the 1961 Agreement, the State argued: (1) if the Commission were to declare the 1961 Agreement unenforceable, future utility companies would have difficulty obtaining necessary building and use permits; and (2) if the Commission were to declare the 1961 Agreement unenforceable, the City could potentially purchase the Sewerage System for $1.00 under the terms of the 1961 Agreement.

The Commission specifically recited and acknowledged both of the State's public interest arguments at page 16 of Order

No. 23725. The Commission rejected, as immaterial, the State's assertion that in the future public utilities might have difficulty obtaining permits if the 1961 Agreement terms were not enforced.[5] The Commission rejected, as inaccurate, the State's assertion that a determination that the free services provision of the 1961 Agreement is unenforceable would trigger a provision allowing the City to purchase the Sewerage System for $1.00, because that provision is only triggered if the Sewerage System owner and operator intends to abandon the system.[6]

On appeal, the State argues for the first time that even if the filed-rate doctrine is applicable, in executing the 1961 Agreement, Kaiser intended to provide the State with free sewerage services as a "charitable contribution." The State argues that this court should establish a charitable purpose exception to the filed-rate doctrine and, implicitly, argues that the free services to the State should be treated as a charitable

---

[5] The Commission characterized and addressed this argument as follows: "[The State's] implication that the 1961 Agreement is an impact fee, and argument that it was provided no notice of the abrogation of the Agreement since there is no reference of it made in the tariff is immaterial. As HAWC correctly states, HAWC is required to charge and collect sewer fees pursuant to the tariff rates for its customer classes, and thus the rates of the 1961 Agreement cannot stand." In other words, the State was, in essence, arguing that, if the 1961 Agreement were deemed unenforceable, future utilities permit applicants might not be able to offer free or discounted future services in lieu of an "impact fee" for their development. In response, the Commission, in essence, concluded that the potential for such a consequence was not material in light of the filed-rate doctrine, which requires HAWC to charge for all of its sewerage services at the rates set forth in the 2004 Tariff.

[6] Section 9 of the 1961 Agreement states, in relevant part:

> If at any time Kaiser intends to abandon its operations and ownership hereunder, it shall, at least 60 days prior to the date of abandonment, give written notice of such intention to both Bishop [Estate] and the City. In that event the City shall have the right to purchase all of Kaiser's rights and operations hereunder, including all of Kaiser's right, title and interest in the sewerage system and all facilities thereof for the sum of ONE DOLLAR ($1.00).

contribution.[1]

First, given the State's failure to raise this argument in the underlying proceedings, it is deemed waived.  See Hawai'i Rules of Appellate Procedure 28(b)(4); see also, e.g., In re Water Use Permit Applications, 94 Hawai'i 97, 152, 9 P.3d 409, 464 (2000).

Moreover, no Hawai'i court has recognized such a limitation to the filed-rate doctrine, and the State fails to identify any other state recognizing the requested exception. Indeed, the State's characterization of the free services provision of the 1961 Agreement as a charitable act appears to be inconsistent with the 1961 Agreement's express and unambiguous statement that "[t]he parties hereto, in consideration of the mutual promises hereinafter contained, agree as follows. . ."  As noted by the State, Kaiser received, as consideration, the contractual right to provide commercial sewerage services to the land encompassed under the 1961 Agreement.  The City, in turn, received consideration in the form of free sewerage services to "defray the City's costs related to allowing the development in that area."  The State's charitable contribution argument fails, in part, because the provision of free sewerage services was not a charitable contribution.

D.    The Contract Clause

The State's third point of error, that the "PUC erred in failing to apply the heightened standard applicable when the State's exercise of its police powers interferes with its own contractual obligations," relates to the Contracts Clause of the United States Constitution.  Article I, section 10, of the Constitution states, in relevant part:  "No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]"  As the State acknowledges, "[d]espite the sweeping terms of its literal

_____

[1]    In a footnote, however, the State acknowledges that it is not a charitable organization in the "traditional" sense.

text, the Supreme Court has construed this prohibition narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively." Matsuda v. City & County of Honolulu, 512 F.3d 1148, 1152 (9th Cir. 2008).

As a threshold matter, the State failed to raise any Contracts Clause or other constitutional challenge in the proceedings before the PUC and presents no argument in support of a plain error review.[8/] Accordingly, this issue is waived. See HRAP Rule 28(b)(4).

In any case, the legal authorities invoked by the State in support of its argument have required heightened scrutiny when a state law interferes with the state's contractual *obligations*, rather than when a state's enactment diminishes that state's benefits under a contract. See Matsuda, 512 F.3d at 1152 (citing U.S. Trust Co. v. New Jersey, 431 U.S. 1, 20-21 (1977)). It appears that courts have uniformly held that municipalities cannot invoke the Contracts Clause against the abrogation of contracts by state law. See, e.g., City of Trenton v. New Jersey, 262 U.S. 182, 186-87 (1923); City of Worcester v. Worcester Consol. Street Railway Co., 196 U.S. 539 (1905); City of Plainfield v. Public Serv. Elec. & Gas Co., 82 N.J. 245, 412 A.2d 759 (1980); Metropolitan Dev. & Hsg. Agency v. South Central Bell Telephone Co., 562 S.W.2d 438, 442-43 (Tenn. Ct. App. 1977); Alameda County v. Janssen, 16 Cal.2d 276, 284, 106 P.2d 11, 15-16 (1940). It is axiomatic that an assignee stands in the shoes of its assignor and that an assignment of rights provides the assignee with "the same legal rights as the assignor had before assignment." Fireman's Fund Ins. Co. v. AIG Hawai'i Ins. Co., Inc., 109 Hawai'i 343, 349, 126 P.3d 386, 392 (2006) (citation omitted). Here, the State

---

[8/]    The State, instead, "asks this court to decide as a matter of law that the impairment of the State's interest in the 1961 Agreement was not reasonable or necessary to fulfill the public purpose of utility regulation." The State has not, however, cited a single case in support of its theory that government bodies, as a matter of law, should be exempted from the filed-rate doctrine.

stands in the shoes of the City and thus cannot invoke the Contracts Clause in this case.

     E.    <u>The Amicus Brief</u>

     Finally, the State argues that the Commission's failure to disclose the Amicus Brief filed by the Commission in the Shopping Center Litigation created an appearance of impropriety that warrants the vacating of Order No. 23725. The State concedes, however, that there is no record evidence of actual bias on the part of the Commission and further acknowledges its failure to raise this contention in the proceedings below.

     In Hawai'i, and within the specific context of administrative proceedings, a "party asserting grounds for disqualification must timely present the objection, either before the commencement of the proceeding or as soon as the disqualifying facts become known." <u>In re Water Use Permit Applications</u>, 94 Hawai'i at 122, 9 P.3d at 434 (citations omitted). Thus, the "unjustified failure to properly raise the issue of disqualification before the agency forecloses any subsequent challenges to the decisionmakers' qualifications on appeal." <u>Id.</u> (citations omitted); <u>see also</u> <u>Office of Disciplinary Counsel v. Au</u>, 107 Hawai'i 327, 338, 113 P.3d 203, 214 (2005) ("Unless the matters of disqualification are unknown to the party at the time of the proceeding and are newly discovered, there can be no excuse for delaying the filing of the suggestion until after rulings are made in the matter, particularly where such rulings may be considered adverse to the movant.") (internal quotation marks and citation omitted).

     The State indisputably failed to raise this argument in the underlying proceedings despite the disclosure of the Amicus Brief in May of 2006, approximately 17 months *prior* to the Commission's final decision in Order No. 23725. The State's

unexplained acquiescence is dispositive.[9]  See In re Water Use Permit Applications, 94 Hawaiʻi at 122-123, 9 P.3d at 434-435 (citations omitted) (rejecting appellate disqualification argument given party's failure to raise the contention in underlying administrative proceeding); see also Au, 107 Hawaiʻi at 339, 113 P.3d at 215 ("Litigants cannot take the heads-I-win-tails-you-lose position of waiting to see whether they win and if they lose moving to disqualify a judge who voted against them.").

V.     CONCLUSION

          For these reasons, Order No. 22254 and Order No. 23725 are affirmed.

On the briefs:

Dorothy Sellers
Solicitor General
for Cross-Appellant
STATE OF HAWAII

Steven K.S. Chung
Chanelle M. Chung

and

Kent D. Morihara
Michael H. Lau
for Appellee
HAWAII-AMERICAN WATER COMPANY

---

[9]     We further note that, within the context of judge recusals, "a party who has made no motion for recusal in the trial court bears the burden on appeal in demonstrating that the judge committed plain error in failing to recuse[] himself or herself."  State v. Gomes, 93 Hawaiʻi 13, 17, 995 P.2d 314, 318 (2000) (citations omitted).  In this regard, the mere "appearance of impropriety," as solely alleged by the State in this matter, has been held insufficient to demonstrate an affect on the substantial rights of the parties for purposes of plain error review.  See id. ("if a judge proceeds in a case when there is (only) an appearance of impropriety in his doing so, the injury is to the judicial system as a whole and not to the substantial rights of the parties.") (internal quotation marks and citations omitted).